(Decided 12th January, 1894.)

---

THE GERMAN SAVINGS BANK OF BALTIMORE CITY *vs.* ROBERT H. RENSHAW.

*Deposit of Stock as Collateral security—Pledge of Stock— Re-pledge—Transfer in Blank of Certificates of Stock— Taken with Notice—Evidence of Usage to Destroy contract.*

R. delivered to N. & Sons, brokers, certain certificates of stock, upon the back of which were blank forms of assignment and powers of attorney. These were signed by R. but the blanks left for the names of the assignor and assignee, and the date were not filled up. The certificates were so delivered as collateral security for stocks purchased, or to be purchased, by N. & Sons, for R. on margins, with authority to N. & Sons, to sell them, if necessary, to meet any indebtedness by R. to them, resulting

German Savings Bank *vs.* Renshaw.

from said stock transactions. N. & Sons afterwards failed in business. At the time of their failure, nothing was due them by R. the balance of accounts between them being in his favor. Before the failure, N. & Sons, had hypothecated said stock to the German Savings Bank, as security for a loan made to themselves. At the time the stock was received by the Bank, the blanks had not been filled up. In an action of *trover* for said stock brought by R. against the Bank, it was HELD:

1st. That having received this stock under said assignments, executed in blank, and conferring only a power to sell, the defendant was put upon its inquiry, as to the right of N. & Sons, to pledge it for their own debt, and must therefore be charged with full notice of the contract by which they held it.

2nd. That the defendant having taken them as collateral for the debt of N. & Sons, acquired no better title than N. & Sons themselves possessed.

3rd. That it was clear from the proof of what transpired between R. and N. & Sons, that it was not intended that the latter should have power to use the collaterals as their own property; although possibly it was contemplated that they should have power to use them by way of re-pledge to raise such aditional sums as the margins for the increased purchases might require.

4th. That under the special contract, N. & Sons had no right to use the stock in such way as to subvert the right of R. to a return of his pledged securities, upon the payment of his indebtedness.

5th. That no evidence of usage was admissible which would destroy the contract.

6th. That at the time of the failure of N. & Sons, R. having then fully paid his indebtedness to them, was in a position to demand the return of the pledged securities, and upon their failure to do so, was entitled to maintain an action against them for their value.

7tb. That the defendant, as a taker with notice, stood merely in the place of the original pledgee, and was bound to restore it to the owner, in case the original pledgee would be obliged to restore it if no second sale or pledge had been made.

APPEAL from the Baltimore City Court.

The case is stated in the opinion of the Court.

*Exception.*—At the trial the plaintiff offered the three following prayers:

1. That if the jury find from the evidence that in January, 1891, the plaintiff applied to J. J. Nicholson & Sons to purchase for him on ten per cent. margin one hundred shares of Norfolk and Western Railroad stock, and deposited with them in cash the sum of two thousand dollars, and that the said Nicholson & Sons purchased the said stock to be carried on margin for him; and if the jury further find that in said interview the plaintiff further inquired whether the said Nicholson & Sons would make further purchases for him on the deposit of stocks as a margin for such purchases, and said Nicholsons agreed to do so; and if the jury further find that in pursuance of said understanding the plaintiff thereafter, as set out in the correspondence offered in evidence, deposited as such margin for further purchases of stock to be made for his account the following securities belonging to him, namely, three hundred shares of Texas Pacific Railroad stock, the certificates for which were issued in his name, and likewise ten Texas Pacific Railroad Income Bonds, being coupon bonds of the denomination of one thousand dollars each, and also five hundred shares of second Preferred Stock of the East Tennessee, Virginia and Georgia Railroad Company, the certificates for which were issued in his name, including two certificates number 5450 and 5451, for one hundred shares each; and if they further find that the said Nicholson & Sons purchased from time to time, for the plaintiff, the Norfolk and Western Railroad Stock mentioned in the evidence; that at the time the said securities were so deposited by the plaintiff with the said Nicholson and Sons the powers of attorney printed on the back of said certificates of stock in said respective railroad companies were in blank except that they were signed by the plaintiff with a witness to his signature only, and that sub-

sequently said J. J. Nicholson and Sons, on or about December 15, 1891, hypothecated said certificates Nos. 5450 and 5451 of said East Tennessee, Virginia and Georgia Railroad Stock to the defendant bank as collateral security for a loan of $15,000 made by said bank to said J. J. Nicholson & Sons, and that the said defendant bank took and received the same as such collateral, and that at the time they so passed into the hands of said bank as security as aforesaid, there was no writing on the backs of said certificates but the name of said plaintiff and said witness, and that the plaintiff never otherwise authorized the said J. J. Nicholson & Sons to pledge said securities, then the plaintiff is entitled to recover the market value of the said two hundred shares of East Tennessee, Virginia and Georgia Preferred Stock, on the 15th day of December, 1891, with interest thereon from said date.

5. That there is no evidence in this case legally sufficient to prevent the plaintiff from asserting his rights to the stock, the subject-matter of this case, by reason of his having handed to J. J. Nicholson & Sons the certificate thereof, with his name signed to the power of attorney on the back thereof, with a witness to his signature.

7. That there is no evidence in this case legally sufficient to go to the jury from which the jury can find the existence of a custom authorizing the firm of J. J. Nicholson & Sons to re-hypothecate the securities deposited with them by plaintiff as margin for purchases by them of stock of the Norfolk and Western Railroad on his behalf.

And the defendant offered the six prayers following:

1. There is no evidence in this case legally sufficient to show that, prior to the institution of this suit, any part of the debt due by the plaintiff to the firm of J. J. Nicholson & Sons, and for which the two hundred shares

of stock mentioned in the declaration were pledged by the plaintiff to J. J. Nicholson & Sons, has been paid or tendered to the defendant, and therefore the verdict must be for the defendant.

2. If the jury believe from the evidence that the two hundred shares of East Tennessee, Virginia and Georgia Second Preferred Stock mentioned in the declaration were delivered by the plaintiff to the firm of J. J. Nicholson & Sons, stock brokers, then conducting business in Baltimore City, as part of the margin upon which said firm was to buy and carry Norfolk and Western Preferred Stock for the plaintiff; that according to the meaning of a contract to buy and carry stocks on margin as established by a universal and uniform custom in Baltimore City, a stock broker, to enable him to buy and carry such stocks, has the authority to pledge any stocks or other securities delivered to him as margin as aforesaid, for the purpose of supplying the margin required to carry said stocks; and if the jury further find that said firm of J. J. Nicholson & Sons did pledge said 200 shares of stock to the defendant for a valuable and *bona fide* consideration; that the sum of $1,613.18 still remains due and unpaid of the indebtedness for which said 200 shares of stock were pledged to the defendant, and that no tender has been made to the defendant of any part of said indebtedness, or to the defendant, or to the firm of J. J. Nicholson & Sons, or the trustees of such firm, of any part of the debt for which they may find said 200 shares of stock were pledged by the plaintiff to said firm, then their verdict must be for the defendant.

3. If the jury find that, according to the meaning of a contract to buy and carry stocks on margin, as established by a universal and uniform custom in Baltimore City, a stock broker, to enable him to buy and carry such stocks, has the authority to pledge any stocks or

securities delivered to him as margin for the purpose of supplying the margin required to carry said stocks; that the certificates for the 200 shares of East Tennessee, Virginia and Georgia Second Preferred Stock mentioned in the declaration were delivered by the plaintiff to the firm of J. J. Nicholson & Sons, stock brokers, then conducting business in Baltimore City, as part of the margin upon which said firm was to buy and carry Norfolk and Western Preferred Stock for the plaintiff; that said certificates then stood in the name of Robert H. Renshaw and had on the back thereof an assignment and power of attorney signed by the said Robert H. Renshaw and witnessed by R. Powell Page, but that the names of the transferree and attorney and the date had been left blank in such assignment and power of attorney; that said certificates had been put in that condition by the plaintiff for the purpose of putting said stock in condition to be used as margin as aforesaid; that said certificates in that condition would be deliverable to any institution from which said firm might wish to borrow money to supply the cash margin which they may find is usually required in contracts of this sort; and if the jury further find that said firm of J. J. Nicholson & Sons took said certificates in that condition to defendant's bank, and upon the faith thereof induced the defendant to surrender certain securities then pledged to it to secure a loan from it to said firm and to have substituted therefor said 200 shares of stock and other securities of equivalent aggregate value as the securities so surrendered; that the sum of $1,613.18 still remains due and unpaid on said loan; that the defendant still holds said stock and has had the same transferred upon the books of said corporation into its own name, and that the defendant has not been paid or tendered said $1,613.18, then their verdict must be for the defendant.

4. If the jury believe that the 200 shares of stock mentioned in the declaration were pledged by the plain-

tiff to the firm of J. J. Nicholson & Sons as margin security, upon which said firm was to carry other stocks purchased for the plaintiff, and that it was understood that such firm should have the power to sub-pledge said 200 shares of stock, and if the jury further find that said firm did sub-pledge such stock to the defendant for a *bona fide* consideration, that the sum of $1,613.18 still remains due and unpaid of the indebtedness for which said 200 shares of stock were pledged to the defendant, and that no tender has been made to the defendant of any part of said remaining indebtedness, or to the defendant, or to the firm of J. J. Nicholson & Sons, or to the trustees of said firm of any part of the debt for which they may find said 200 shares of stock were pledged by the plaintiff to said firm, then their verdict must be for the defendant.

5. Even if the jury shall find for the plaintiff under the instructions of the Court, they are instructed that the true measure of damages is the market value of the 200 shares of stock mentioned in the declaration at the time of its alleged conversion, less such a proportion of the entire debt then due by the plaintiff to the firm of J. J. Nicholson & Sons (if the jury shall find such debt), as such market value of said stock bore at the date of said conversion to the then aggregate market value of all the securities which the jury may find had been pledged by the plaintiff to said firm as security for any such debt, with interest, on the resulting amount so ascertained, from the time of conversion to date; in determining the aggregate value of any of the above mentioned stocks and securities, the jury are instructed that they are not to include therein the value of any stocks or securities which they may find had been sold by said firm previous to the conversion pursuant to orders from the plaintiff.

6. That any sale or pledge of any of the stocks and securities mentioned in evidence, which the jury may find to have been made by the firm of J. J. Nicholson & Sons without authority of the plaintiff, did not extinguish any part of the debt due by the plaintiff to said firm (if they shall find such debt), but that the correct amount of any debt due by the plaintiff to said firm at the date of the alleged conversion of the 200 shares of stock mentioned in the declaration (if they shall find such debt,) is what they may find to be then due and owing by the plaintiff to said firm by charging the plaintiff with all the cost of and commissions on any Norfolk and Western Preferred Stock which they may find had been purchased by said firm for him, and with all money which they may find had been paid to or on account of said plaintiff, and with all interest that they may find was then due by the plaintiff to said firm, and by crediting said plaintiff with the proceeds of any sales of said Norfolk and Western Preferred Stock which they may find had been made by said firm pursuant to orders from the plaintiff, less any commissions which they may find due on said sales, and by crediting the plaintiff with the aggregate amount which they may find said plaintiff paid to said firm on his account, and with any dividends which they may find the said firm had received on any of the stock or securities purchased by said firm for the plaintiff, or deposited with said firm by said plaintiff as margin (if they shall find such purchase and deposit), and with all interest they may find said firm then owed to the said plaintiff.

The plaintiff excepted specially to the granting of the defendant's second prayer, because there was no evidence legally sufficient that the meaning of a contract to buy and carry stocks on margin as established by a universal and uniform custom in Baltimore City, a stock broker, to enable him to buy and carry such stocks, has the

authority to pledge any stocks or other securities delivered to him as margin as aforesaid, for the purpose of supplying the margin required to carry said stocks; and because there is no evidence legally sufficient of said alleged custom.

The plaintiff excepted specially to the granting of defendant's third prayer, because there was no evidence in the case legally sufficient to establish a universal and uniform custom in Baltimore to enable a stock broker, buying stock on margin, to pledge any stocks or securities delivered to him as margin for the purpose of supplying the margin required to carry said stocks.

The plaintiff specially excepted to the granting of the defendant's fourth prayer, because there was no evidence in this case that it was understood between plaintiff and J. J. Nicholson & Sons that the said J. J. Nicholson & Sons should have the power to sub-pledge said stocks.

The Court (WRIGHT, J.,) granted the first, fifth, and seventh prayers of the plaintiff, and rejected all of the prayers of the defendant.

The defendant excepted, and the verdict and judgment being against it, appealed.

The cause was argued before ROBINSON, C. J., BRYAN, FOWLER, PAGE, ROBERTS, and McSHERRY, J.

*H. M. Benzinger, J. Pentland Brown*, and *Bernard Carter*, (with whom was *James S. Caldwell*, on the brief,) for the appellant.

*J. S. T. Waters, Frederick W. Brune*, and *Stewart Brown*, for the appellee.

PAGE, J., delivered the opinion of the Court.

This is an action of *trover* brought by Robert H. Renshaw against the German Savings Bank of Baltimore,

to recover the value of two hundred shares of second Preferred Stock of the East Tennessee, Virginia and Georgia Railroad Company.   The only exception is to the action of the Court below in granting the first, fifth and seventh of the plaintiff's prayers, and in rejecting all of the instructions asked for by the defendant.

Evidence was offered tending to prove that in January, 1891, Nicholson & Sons agreed to purchase one hundred shares of Norfolk and Western Preferred Stock, on a margin of ten per cent.   In the interview which then took place between them, and which was the first and only one, Renshaw endorsed to them two checks for $1,000 each, and told them he would place securities in their hands if they would make further purchases for him, or "to enable them to make further purchases for him upon the credit of his securities."   Upon their agreeing to this, he subsequently through a Mr. Hoff, delivered to them three hundred shares of East Tennessee, Virginia and Georgia stock, three hundred shares of Texas Pacific, and $10,000 Income Bonds of the Texas Pacific Railroad Company.   On the 9th of January, he writes to the Nicholsons: "Send for execution blank powers authorizing sale of collaterals.   As soon as the powers reach me I shall execute them and return to you. * * * As I am anxious to increase my holdings in Norfolk and Western Pfd., kindly wire me how many shares you are willing to *carry for me on my collaterals, including the* $2,000 *recently delivered to you.*"   On the 10th, the Nicholsons sent him the stock to be endorsed by him, and in due time it was endorsed as will hereafter appear, and returned.   On the same day Renshaw states in his letter of that date his purpose more specifically; he says: "These securities I wish you to hold *as collaterals*, for which purpose I shall be glad to execute the usual powers of attorney, etc."   On a later date he mailed them 200 more shares of the Tennessee stock

for the same purposes. The assignments and powers of attorney endorsed upon the certificates of stock thus placed in the hands of the Nicholsons were in blank, and in the following terms: "For value received —— have bargained, sold, assigned and tranferred and by these presents do bargain, sell, assign and transfer unto —— the capital stock named in the within certificate, and do hereby constitute and appoint ——, true and lawful attorney, irrevocable for —— and in —— name and stead, but to —— use, to sell, assign, transfer and set over all or any part of the said stock, and for that purpose to make and execute all necessary acts of assignment and transfer, and one or more persons to substitute with like full power. Dated ——.

(Signed,) ROBERT H. RENSHAW.
"Signed and acknowledged in the presence of
(Signed,) R. POWELL PAGE."

In pursuance of this arrangement and the orders of the appellee, the Nicholsons up to the 14th of January, had purchased for him eight hundred shares of Norfolk and Western Preferred, at a total cost of $44,862.50, and had sold them again by his direction, for the aggregate sum of $42,025. By an account stated on May 18th, it appears that Renshaw owed them at that time $997.25, for which they held as security all the stock and bonds originally pledged. After this date, and up to the time of their failure, the Nicholsons purchased for Renshaw five hundred shares of Norfolk and Western Preferred, at an aggregate cost of $26,900, and if he be charged with this, he would be indebted to them, as appears by the account filed, $30,241.32. But before this they had sold two hundred shares of the purchased stock for $10,975, and the residue had been passed by them to other persons as collaterals for loans made on their own account, so that none of it was then in their

possession or under their control. If the cost of this purchased stock be taken from the apparent balance, there would still remain the sum of $3,341.32 due from him to the Nicholsons. But it also appears that prior to their failure, the Nicholsons had pledged for their own account the Texas Pacific Bonds, and the pledgees of them Roche and Coulter, had closed them out; so that at the time of their assignment on any settlement that could have been made between them, a large balance was due Renshaw. Two or three days after the failure of the Nicholsons, Renshaw made application to their trustees for his securities, but was informed by them they had been re-pledged, and later on, he learned that on the 15th of December preceding, the Nicholsons had hypothecated two hundred shares of the Tennessee stock, together *with other* securities, with the appellant, for a loan of $15,000 made by the Bank to them; and that the stock was still in its possession. He thereupon made demand upon the President for its return, but was told by him "that the Bank was then taking measures to have it transferred to itself; that the only papers it held were the certificates for such stock, being those sued for in this case, with the printed form of transfer and power of attorney which were then on the backs of such certificates, signed by Mr. Renshaw and with a witness to such signature." At the time the stock was received by the Bank, the blanks had not been filled up, and there was then due to the Bank by the Nicholsons on account of the loan the sum of $1,600. Renshaw did not then nor afterwards make any tender of money to the Bank.

The nature of assignments and powers of attorney, such as exist here, were fully considered in the case of *Taliaferro vs. First National Bank of Baltimore*, 71 *Md.*, 209. There Miss Taliaferro entrusted her bonds to Veazey *for sale*, with assignments and powers of attorney executed

in blank, in all respects like those under which the appellant now claims, and it was held, that by no possible construction could such powers be regarded as conferring authority upon Veazey to hypothecate the bonds as security for his own debt; that the Bank took them "with no better title than Veazey himself possessed, and was to be charged with notice of such facts and matters as made it reasonable that inquiry should be made into such title." See also *First National Bank of Baltimore vs. Taliaferro, 72 Md.*, 169.

Applying this rule to this case, it follows, that having received this stock under these assignments, executed in blank and conferring only a power to sell, the appellant was put upon its inquiry as to the right of the Nicholsons to pledge it for their own debt, and must therefore be charged with full notice of the contract by which they held it; and, if this be so, the appellant having taken them as collateral for the Nicholsons' debt, acquired no better title than the Nicholsons themselves possessed. What then were the rights and powers of the Nicholsons respecting the stock as against the appellee? Renshaw desired the Nicholsons to buy and carry for him stock on a margin of ten per cent. For that purpose he placed in their hands $2,000 in cash, and certain shares of stock as collateral security. There is some evidence tending to show that the Nicholsons were to be at liberty to rehypothecate the stock to enable them to raise money to the extent of meeting the margin. Renshaw himself said to them, he would place it in their hands to enable them to make further purchases for him upon the credit of his securities, though in his letter of 10th of January he wrote, that he intended them to *"hold"* his securities as collateral. It was without question intended by the parties, that the Nicholsons should use the $2,000 to meet the margins, and it is equally clear that the parties did not intend that the Nicholsons should use the colla-

terals as their own property, though it may be possible that it was contemplated that they should have power to use them by way of re-pledge, to raise such additional sums as the margins for the increased purchases might require. However this may be, it was the right of Renshaw to have a return of his stock upon making good his indebtedness to the Nicholsons, and it was their duty so to use it, that this right of Renshaw should be fully preserved. The rule in such a case is well stated in *Lawrence vs. Maxwell*, 53 *N. Y.*, 19, 23: "Conceding the right to use the stock pledged by way of hypothecation or otherwise as claimed, and that it was out of the actual possession of the defendant, it was his duty at once to regain possession and restore the same to the plaintiff. A neglect or refusal to do so, gave the plaintiff an action as for a conversion of the property. It is immaterial whether the stock was hypothecated by the defendant upon a loan of money for the benefit of the plaintiff's transactions or for his own purposes." "The right to use the stock pledged ceases the instant the debt is paid." *Jones on Pledges, sec.* 496; *Cook on Stock and Stockholders, sec.* 467; *Colebrooke on Collateral Securities, sec.* 306.

Under the special contract, as we have stated it, therefore, the Nicholsons had no right to use the stock in such way as to subvert the right of Renshaw to a return of his pledged securities upon the payment of his indebtedness. And no evidence of usage is admissible which would destroy the contract. Usage can be admitted to interpret the language of a contract where it is obscure, but not to change its legal character, or derogate from the rights of parties, or authorize acts contrary to its provisions. *First National Bank of Baltimore vs. Taliaferro,* 72 *Md.*, 171; *Cook on Stock and Stockholders, sec.* 462, and authorities there cited; *Rich vs. Boyce,* 39 *Md.*, 314; *Kraft vs. Fancher and Brown,* 44 *Md.*, 215; *Fay vs. Gray,* 124 *Mass.*, 500.

In *Oregon & Transcontinental Co. vs. Hilmers, et al.,* 20 *Fed. Rep.,* 717, the plaintiff had deposited certain shares of stock as collateral security for the payment of one million dollars in one year, with authority to sell and assign the collaterals on failure of the pledgor to fulfil his agreement. It was contended that the pledgor understood that the defendants, who were stockbrokers, would be obliged to hypothecate the collateral, to obtain the money. "Upon this theory," said WALLACE, J., "if they had hypothecated the collaterals as his agents, or in such a way that they could be restored to him upon payment of the sum loaned on them, the defendant would not be liable for a conversion. Such a use of the stock might not be inconsistent with the intention of the parties, and would not subvert the ultimate right of the pledgor, and if sanctioned by usage, or if within the contemplation of the parties would not be a conversion. But the defendants assert, that according to the understanding between them and the pledgor, they were to be at liberty to mingle the securities with their own, and raise money on them generally as though they were their own. Such use is utterly inconsistent with the contract of pledge. No evidence of usage is admissible, which would destroy the contract. If the defendants have used the collaterals in such a manner that they could not at once regain them and restore them to the pledgor when the obligation of the latter is discharged, they are liable for a conversion." We do not mean by what we have said, to imply that the broker is bound to return the identical stock that has been pledged, for "one share is exactly similar to, and of the same value as another of the same company," but he must be ready to return an equal quantity of the same issue. *Worthington vs. Tormey,* 34 *Md.,* 193; *Price and Wife vs. Gover,* 40 *Md.,* 111.

It has already been shown that, at the time of the Nicholsons' failure, upon a proper settlement, Renshaw

had fully paid his indebtedness to them, and, if this was so, was in a position to demand the return of the pledged securities, and upon their failure to do so, was entitled to maintain an action against them for their value. With knowledge of these relative rights and duties existing between the original pledgor and pledgee, the appellant is fully chargeable, under the rule laid down in *Taliaferro's Case* above cited. It had notice of everything of which proper inquiry would have informed it. It must be held to have known, when it received the stock, that it had been pledged to the Nicholsons under the special contract, and that Renshaw would be entitled to its return upon the discharge of his obligation. It was a taker with notice, and as such stands merely in the place of the pledgee, and "must restore the stock to the owner in case the pledgee would be obliged to restore it had no second sale or pledge been made." *Cook on Stock and Stockholders*, sec. 472.

We think the cases of *Donald vs. Suckling, L. R.*, 1 *Q. B.*, 618, *Johnson vs. Stear,* 15 *C. B.*, (*N. S.*,) 330, and *Talty vs. Freedman's Savings and Trust Co.*, 93 *U. S.*, 321, fully support the view we have taken of this case. In these cases the debt from the first pledgor to the first pledgee was unpaid at the time the suits were brought, and it was held the pledgor could not recover the pledge, without tendering the re-pledgee the amount for which it was originally pledged. In the last mentioned case, Swayne, J., said: "A tender to the second pledgee of the amount due from the first pledgor to the first pledgee, extinguishes *ipso facto* the title of the second pledgee;" and citing from *Story on Bailments*, the learned Judge in the same opinion lays down this rule: "If the pawnee should undertake to pledge the property (not being negotiable securities) for a debt beyond his own, or to make a transfer thereof as if he were the actual owner, it is clear that in such case he would be

guilty of a breach of trust, and his creditor would acquire no title beyond that held by the pawnee." When the amount due from the first pledgor to the first pledgee is not discharged, the condition upon which the former is entitled to the return of his property, has not been complied with. These cases decide that under such circumstances this condition may be met by a tender to the re-pledgee; and the necessity for this follows from the fact that the right of the original pledgor to have back his property can only arise upon the discharge of the indebtedness on account of which the pledge was made.

It follows from what we have said that we find no error in the rulings of the Court below, and the judgment must therefore be affirmed.

*Judgment affirmed.*

(Decided 12th January, 1894.)