## SPALDING L. JENKINS *v.* CONTINENTAL TRUST COMPANY.

*Uniform Stock Transfer Act—Rights of Bona Fide Pledgee.*

Under Code, art. 23, secs. 51, 57, 69, 71 (Uniform Stock Transfer Act), where one holding a certificate of stock, with a power of attorney indorsed thereon in blank, to "sell, assign and transfer" it, pledges it for his own debt, the pledgee, taking it in good faith, in the usual course of business, and for value, without notice of any fact making the transfer wrongful, is protected against the claim of the owner of the certificate, who was induced by fraud to indorse or deliver it, or whose agent entrusted therewith has so pledged it in excess of his authority.
pp. 421-429

The Uniform Stock Transfer Act should be so construed as to bring the law of this state into conformity with that of other states, in so far as this is possible.                    p. 427.

*Decided April 8th, 1926.*

Appeal from the Superior Court of Baltimore City (UL-MAN, J.).

Action by Spalding L. Jenkins against the Continental Trust Company. From a judgment for defendant, plaintiff appeals. Affirmed.

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Frank B. Ober* and *Robert France,* with whom were *Janney, Ober, Slingluff & Williams* on the brief, for the appellant.

*Charles McHenry Howard* and *James Piper,* with whom were *Piper, Carey & Hall* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

This case was heard by Judge Ulman, sitting as a jury, in the Superior Court of Baltimore City, and a verdict was rendered and judgment entered thereon in favor of the defendant, the Continental Trust Company, the appellee in this court, upon the following agreed statement of facts:

"1.   That the plaintiff, Spalding L. Jenkins, is a resident of Baltimore City, and the defendant, The Continental Trust Company, is a corporation duly authorized under the laws of Maryland to conduct the business of a Trust Company in Baltimore City, and that the defendant was authorized to make demand loans secured by collateral and regularly engaged in the making of such loans in the course of ordinary business, and had for the period of some years prior to the time herein referred to been accustomed to make such loans to the brokerage firm of Archer, Harvey & Company, which firm was on the 23rd day of June, 1921, indebted to the defendant on various loans secured by collateral.

"2.   That the pleadings and former stipulation filed herein be withdrawn and the case be stated and submitted to the Court for its opinion on the law as follows:

"(a)   That the plaintiff, Spalding L. Jenkins, since about the year 1903 or 1904, maintained a trading account with the stock brokerage firm of Archer, Harvey & Company, doing business in Baltimore City. That on the 21st day of June, 1921, if the instructions of the plaintiff had been complied with, he was carrying with Archer, Harvey & Company 593 shares of the Common Stock of the Houston Oil Company, 200 shares of the Preferred Stock of the Houston Oil Company, $10,000 six per cent. Bonds of the Georgia & Pennsylvania Railroad Company, 200 shares of the Superior Oil Company, 9 shares of the Common Stock of the Cosden Oil Company and a $500 five per cent. bond of the Elk Ridge Hunt Club, all of the approxi-

mate value of $53,600, and was indebted to said firm in the sum of $44,923.36.

"(b)   That on the 21st day of June, 1921, Archer, Harvey & Company informed the plaintiff by telephone that they would require $10,000 in cash or securities as additional margin on his account, in response to which call Spalding L. Jenkins visited the office of Archer, Harvey & Company on that date, and then and there was advised of the status of his account, as above set forth.  That there was delivered to him the pencil memorandum which purported to show the account of Spalding L. Jenkins as it stood on June 20, 1921; * * * that * * * Archer, Harvey & Company went over this memorandum with the said Spalding L. Jenkins, and figured the margin that would be required on this account, in accordance with their custom, and these figures * * * indicated that a margin of $18,700 would be required.  That the said Spalding L. Jenkins did thereupon deliver to said Archer, Harvey & Company Certificate No. 14961, issued May 19, 1920, for 111 shares of the Common Capital Stock of the United States Fidelity and Guaranty Company, a corporation organized under the laws of Maryland, of the approximate value of $12,876, and received from Archer, Harvey & Company a receipt for said certificate, * * * and at the same time signed the power of attorney on the back of said certificate. * * * That said Spalding L. Jenkins knew and intended when he delivered said certificate that the said Archer, Harvey & Company could and might rehypothecate the same to protect the Jenkins account.

"(c)   That as a matter of fact on the 21st day of June, 1921, the said Archer, Harvey & Company did not in truth and in fact have all of the securities of said Spalding L. Jenkins in their possession, and on such of his securities as they did have on hand they had borrowed to the full extent of the value thereof as collateral, and the firm of Archer, Harvey & Company had without instructions from Spalding L. Jenkins and without his knowledge previously sold most

of the said securities so carried for him, and that the said Jenkins was not indebted at all to Archer, Harvey & Company, but, on the contrary, Archer, Harvey & Company were indebted to him in the sum of approximately $9,000, and in fact were at that time insolvent, in that the value of their assets did not equal their liabilities, all of which was discovered some time after December 22, 1921.

"(d)    That on or about June 23, 1921, Archer, Harvey & Company, * * * without the knowledge of Spalding L Jenkins, borrowed from the defendant the sum of $10,000, and executed its note, * * * and delivered the certificate of 111 shares of the stock of the United States Fidelity & Guaranty Company, to The Continental Trust Company, at the same time guaranteeing the signature of Spalding L. Jenkins endorsed on said certificate by placing its name beneath the signature of Spalding L. Jenkins, with the intent and for the purpose of securing such loan of $10,000 and any other indebtedness to The Continental Trust Company in accordance with the terms of said note.    That at the time The Continental Trust Company received the certificate of stock aforesaid and made said loan thereon, and until the interview of December 20, 1921, next mentioned, it had no knowledge, actual or implied, of any interest of the said Jenkins in the said stock or the condition of Archer, Harvey & Company, or the relations between said Jenkins and Archer, Harvey & Company, except such, if any, as might be indicated by the stock certificate itself, including the power of attorneys, signatures, assignments and/or endorsements thereon.    That on the 20th day of December, Spalding L. Jenkins, having heard that Archer, Harvey & Company were in financial difficulty, and having ascertained that his stock was in the possession of The Continental Trust Company, visited the office of The Continental Trust Company, told the Vice-President thereof of the situation of said Archer, Harvey & Company, and informed him that the stock of the United States Fidelity & Guaranty Company

held by said trust company was his stock, and requested The Continental Trust Company to take no action with respect thereto. That subsequently, to wit, on the morning of December 22, 1921, without notice to the plaintiff, defendant, having theretofore made due and proper demand on said Archer, Harvey & Company for the payment of said loan and no payment having been made, sold on the Baltimore Stock Exchange where said stock was customarily dealt in, 100 shares of the aforesaid 111 shares of the United States Fidelity & Guaranty Company stock at the price of $126 per share, less the usual brokerage commission, producing the net amount of $12,549, out of which it repaid to itself the amount of the note of Archer, Harvey & Company for the loan made at the time when said stock was pledged, and applied the surplus in accordance with one of the terms of said note toward the payment of other indebtedness of the said firm of Archer, Harvey & Company to it evidenced by other notes for loans similarly made prior to December 20, 1921, and that The Continental Trust Company thereafter delivered to the Receiver in Bankruptcy of Archer, Harvey & Company the remaining 11 shares of stock of the United States Fidelity and Guaranty Company. The amount to which the plaintiff would be entitled to judgment if successful is $9,015.12.

"(e) That a petition in bankruptcy was filed against Archer, Harvey & Company on the 29th day of December, 1921, and that said firm has been adjudicated a bankrupt and was and is hopelessly insolvent.

Upon the above stated facts the court was asked to decide the following question:

"Did or did not the defendant, by virtue of the pledge of the certificate for the stock of the United States Fidelity and Guaranty Company, as set forth in the foregoing statement, acquire such title to the shares represented by said certificate, that its title thereto for the purpose of such pledge was superior to

> any title of the plaintiff, in such manner that the ac-
> ceptance of said shares in pledge, or the subsequent
> sale thereof by the defendant as hereinbefore recited
> was not a conversion of said stock as against the plain-
> tiff entitling him to maintain an action of trover
> against the defendant on such alleged conversion?"

It was agreed that, upon the determination of this ques-
tion in favor of the plaintiff, judgment should be entered
for the plaintiff for the sum of $9,015.12, with interest and
costs, or if determined in favor of the defendant, a judg-
ment should be entered for its costs. Each of the parties
reserved the right to appeal to this court from any judgment
so entered against him or it, and, as the judgment was
against the plaintiff, he has appealed.

The question raised in the court below was whether there
was a conversion by the defendant of the plaintiff's certifi-
cate of stock. The determination of this question depends
upon the wording of the endorsement or power of attorney
found upon the back of the certificate.

It is contended by the plaintiff, appellant in this court,
that by such endorsement or power of attorney, "the defend-
ant was put on notice of the fact that at the time Archer,
Harvey & Company delivered, as collateral, for its personal
loan, the Jenkins certificate, it was apparent from the power
of attorney through which title purported to pass to the
Continental Trust Company that Archer, Harvey & Com-
pany was acting solely as the agent of Jenkins, to sell, as-
sign and transfer the certificate of stock and the shares repre-
sented thereby, and had no authority or power to pledge the
certificate for its personal indebtedness." In support of
this contention the plaintiff cites the cases of *Taliaferro
v. First Nat. Bank,* 71 Md. 200; *German Savings Bank v.
Renshaw,* 78 Md. 475; *Merchants Bank v. Williams,* 110
Md. 334.

In *Taliaferro v. First Nat. Bank, supra,* Mrs. Taliaferro
and her sister, Mrs. Sarah L. Waters, each owned $8,600 of

registered Virginian Coupon Consols, payable to them re-
spectively or to their respective order. Wishing to dispose
of the securities, the owners entrusted them to I. Parker
Veazey to be sold by him when they reached sixty cents on
the dollar. To this end, by form of assignment appearing
upon the back thereof, they were assigned to blank, and
blank was, by power of attorney likewise appearing upon the
back of the securities, appointed to sell, assign and transfer
such securities. They were thereafter pledged by Veazey
to the bank to secure a personal loan from it to him. The
loan was not paid and the securities were sold by the bank.
The court said in that case, "that Veazey had no title what-
ever to these securities. They did not belong to him. They
had been entrusted to him for sale. * * * Upon their face
they disclosed the fact that he was not the owner. The
blank assignment and power of attorney did not operate
as an endorsement of them to him. It was a power to sell
and not a power to pledge. It can by no possible construc-
tion be made to appear to be a power to pledge for debt.
* * * The very face of the instrument shows that it author-
ized the attorney to bargain and sell and transfer to blank,
but not to pledge for debt. Any one taking this instrument
must necessarily see this. A power to sell does not authorize
the agent to pledge for his own debt the thing which he was
employed to sell. *Story on Agency,* sec. 78; *Byles on Bills,*
25; *Bank v. Livingston,* 74 N. Y. 223; *Haynes v. Foster,*
2 Cr. & M. 237."

In *German Savings Bank v. Renshaw, supra,* Renshaw
delivered to Nicholson & Sons, brokers, certain certificates
of stock, upon the back of which were blank forms of assign-
ment and power of attorney. These were signed by Ren-
shaw, but the blanks were left for the names of the assignors
and assignees, and the dates were not filled up. The certifi-
cates were so delivered as collateral security for stock pur-
chased, or to be purchased, by Nicholson & Sons for Ren-
shaw on margin, with authority to Nicholson & Sons to sell
them, if necessary, to meet any indebtedness by Renshaw

to them, resulting from said stock transactions.  Nicholson & Sons thereafter failed in business.  At the time of their failure nothing was due them by Renshaw, the balance of accounts between them being in his favor.  Before the failure Nicholson & Sons had hypothecated said stock to the German Savings Bank as security for a loan made to themselves.  At the time the stock was received by the bank, the blanks had not been filled up.

In that case, which was an action of trover, brought by Renshaw against the bank for said stock, after applying the rule, laid down in *Taliaferro v. First Nat. Bank, supra,* that the bank took them (the securities) "with no better title than Veazey himself possessed," and took them, too, with distinct notice, imparted by the instruments and powers of attorney, that there was ground to question whether Veazey was authorized to deal with them as he did"; the Court said: "It follows, that having received this stock under these assignments, executed in blank and conferring only a power to sell, the appellant (the German Savings Bank) was put upon its inquiry as to the right of the Nicholsons to pledge it for their own debt, and must therefore be charged with full notice of the contract by which they held it; and, if this be so, the appellant having taken them as collateral for the Nicholsons' debt, acquired no better title than the Nicholsons themselves possessed.  What then were the rights and powers of the Nicholsons respecting the stock as against the appellee?  Renshaw desired the Nicholsons to buy and carry for him stock on a margin of ten per cent.  For that purpose he placed in their hands $2,000 in cash, and certain shares of stock as collateral security.  There is some evidence tending to show that the Nicholsons were to be at liberty to rehypothecate the stock to enable them to raise money to the extent of meeting the margin.  Renshaw himself said to them, he would place it in their hands to enable them to make further purchases for him upon the credit of his securities, though in his letter of the 10th of January he wrote that he intended them to "hold" his securities as

collateral. It was without question intended by the parties that the Nicholsons should use the $2,000 to meet the margins, and it is equally clear that the parties did not intend that the Nicholsons should use the collaterals as their own property, though it may be possible that it was contemplated that they should have power to use them by way of re-pledge, to raise such additional sums as the margins for the increased purchases might require. However this may be, it was the right of Renshaw to have a return of his stock upon making good his indebtedness to the Nicholsons, and it was their duty so to use it, that this right of Renshaw should be fully preserved. * * * Under the special contract, as we have stated it, therefore, the Nicholsons had no right to use the stock in such way as to subvert the right of Renshaw to a return of his pledged securities upon the payment of his indebtedness."

In *Merchants Bank v. Williams, supra,* the plaintiff, Mrs. Williams, was the owner of one hundred shares of the common stock of the Wabash Railroad Company. The certificate representing this stock was delivered to Wilson, Colston & Company, brokers and bankers, as security for a loan, and the latter thereafter rehypothecated it with the Merchants' National Bank as collateral to secure an individual indebtedness owing by them to the bank. Upon the back of the certificate, at the time of its delivery to Wilson, Colston & Company, was an assignment in blank, also a power of attorney to one named therein to sell, assign and transfer the stock represented thereby. The Court, in speaking of the assignment and power of attorney, said: "It is definitely settled in this state that such an assignment and such powers of attorney do not clothe the brokers with whom the stock has been pledged with the *indicia* of absolute ownership, and further that such indorsements give no right to the brokers to pledge the security for his own debt, and that any one who accepts the stock as security for a loan to the pledging broker is chargable with notice of the right of the real owner, or original pledgor."

There can be no question that the law as above stated was the law of this state at the time of the passage of the "Uniform Stock Transfer Act," by the General Assembly of Maryland at its January Session, 1910, but this was not the law in other states, where, as stated by Judge McSherry in *Taliaferro v. First Nat. Bank,* courts of the highest respectability have held directly opposite views as to the effect of such transfers or powers of attorney, mentioning particularly the New York cases, in which it was declared that such transfer of itself carried both the equitable and legal title to the shares represented by the certificate so transferred; and Mr. Cook, in stating the prevailing rule of law in respect to such transfers, says (*Cook on Corporations,* vol. 2, sec. 473, 8th Ed.) : "Where a pledgee of certificates of stock indorsed in blank takes the certificates and sells or pledges them to another, who takes such certificates in good faith and for value, and without notice that his vendor or pledgor held them as a pledge, the purchaser or pledgee from the pledgee is as fully protected in his rights as though the person with whom he dealt was the absolute owner of the stock." It is said by the author in a note to the above section, that "In a decision in Maryland (*German Savings Bank v. Renshaw*) an unusual distinction is drawn between the right of a *bona fide* purchaser and a *bona fide* pledgee."

The fact that the Maryland decisions are not in accord with the prevailing rule is also mentioned and referred to in *Machen, Modern Law of Corporations,* vol. 1, sec. 896, p. 723, and in *Fletcher, Cyclopedia of Corporations,* vol. 6, sec. 3853, p. 6847, and also in the cumulative supplement of 1922 to *Thompson on Corporations* (2d ed.), sec. 4258, and among the cases applying the prevailing rule are: *Woods' Appeal* (1880), 92 Pa. St. 379; *Baker v. Davie* (1912), 211 Mass. 429, 435; *Mount Holly, etc., Co. v. Ferree* (1864), 17 N. J. Eq. 117; *Otis v. Gardner* (1883), 105 Ill. 436; *Maxwell v. Foster* (1903), 67 S. C. 377; *Union Trust Co. v. Oliver* (1915), 214 N. Y. 517; *Hellman etc. Bank v. Armstrong* (1919), 39 Cal. App. 483.

It was, no doubt, the want of harmony in the rulings of the courts of the different states upon the question of the effect of such assignments and powers of attorney, and upon other questions relative to the transfer of stock, that suggested the passage of the act known as the "Uniform Stock Transfer Act," by at least fifteen of the states, including New York, Pennsylvania, Illinois, Massachusetts, New Jersey, Michigan, Ohio, Maryland and others; and it is upon the provisions of that act that we are to determine whether the law of this state, as laid down in the decisions from which we have quoted, has been changed thereby, and to decide the question presented by this appeal.

Section 37A of the Uniform Stock Transfer Act, as it appears in section 38 of article 23 of the Code of 1912 and in section 51 of article 23 of the Code of 1924, provides:

"Title to a certificate and to the shares represented thereby can be transferred only—

"(a)  By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or

"(b)  By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby.  Such assignment or power of attorney may be either in blank or to a specified person."

It is provided in section 57 of article 23 of the Code that:

"If the indorsement or delivery of a certificate (a) was procured by fraud or duress; or (b) was made under such mistake as to make the indorsement or delivery inequitable; or if the delivery of the certificate was made (c) without authority from the owner; or (d) after the owner's death or legal incapacity, the possession of the certificate may be reclaimed and the transfer thereof rescinded; unless (1) the certificate

has been transferred to a purchaser for value in good
faith without notice of any facts making the transfer
wrongful; or (2) the injured person has elected to
waive the injury, or has been guilty of laches in en-
deavoring to enforce his rights."

In section 69 of article 23 of the Code it is said that:
"A certificate is indorsed when an assignment or a
power of attorney to sell, assign or transfer the certi-
ficate or the shares represented thereby is written on
the certificate and signed by the person appearing by
the certificate to be the owner of the shares represented
thereby, or when the signature of such person is writ-
ten without more upon the back of the certificate. In
any of such cases a certificate is indorsed, though it
has not been delivered."

Section 71 defines "delivery" to mean a "voluntary trans-
fer of possession from one person to another," and "pur-
chaser" is said "to include mortgagee and pledgee," while
"value" is said to mean "any consideration sufficient to sup-
port a simple contract," and a thing is said to be done "in
good faith" within the meaning of the act "when it is in
fact done honestly, whether it be done negligently or not."

In section 68 of article 23 of the Code it is provided that
all sections of the act "shall be so interpreted and construed
as to effect their general purpose to make uniform the laws
of those states which enact them."

In *Whitcomb v. Nat. Exchange Bank,* 123 Md. 612, this
Court, in discussing the "Negotiable Instruments Act," said:
"The primary purpose of its enactment was to secure uni-
formity in the law governing negotiable instruments. *Van-
derford v. The Farmers' and Mechanics' National Bank of
Westminster,* 105 Md. 164. In order that this object may
be realized it is important that differences of judicial con-
struction as to its application should be avoided so far as
may be reasonably practicable. This end can best be at-
tained by allowing to the language of the statute the full

effect to which it is legitimately entitled. The surest means of producing an opposite tendency would be the attempt to introduce possible but unnecessary distinctions and qualifications for the purpose of restricting the scope and meaning of the terms employed in this well-considered legislation." In giving effect to the language of the statute we should have in mind the above provisions of the statute and this direction of the court.

The statute, section 51, provides that "a transfer is made by delivery of the certificate indorsed either in blank or to a specific person," and a certificate is said to be indorsed (section 69) "when an assignment or power of attorney to sell, assign or transfer the certificate or the shares represented thereby is written on the certificate and signed by the person appearing by the certificate to be the owner of the shares."

The sufficiency of the transfer in this case seems to be fully sustained by the statute. The certificate representing the stock in question was delivered to the defendant with a blank power of attorney to sell, assign, and transfer the same, written thereon by the person appearing by the certificate to be the owner of the shares of stock. The stock was taken in pledge by the appellee in the usual course of business. And, though the indorsement was fraudulently procured, the certificate was transferred to the pledgee in good faith, for value, without notice of any fact making the transfer wrongful, which under the statute protected him against the claims of the owner who had been induced by fraud to indorse or deliver the same, or whose agent had pledged it in excess of his authority.

The power of attorney was to sell, assign and transfer the stock represented by the certificate, but in our opinion, this power, under the express provisions of the statute, authorized the pledging of the stock. By the statute, title to stock passes by an indorsement containing such power. It is the method particularly pointed out by the statute for the transfer of stock, and it would be unreasonable to assume that

the statute was providing only for a restrictive assignment or transfer. That a right to sell includes the right to pledge is further shown by the provision of the statute, where it is said the word "purchaser," when used in the act, "includes mortgagee and pledgee"; moreover, such construction of the statute makes the law of this state conform to the decisions of other states upon this question, and, as we have said, it was for such purpose that the act was passed.

The conclusion reached by the lower court was, we think, correct, and its judgment will be affirmed.

*Judgment affirmed, with costs.*