MERCHANTS' NATIONAL BANK, GARNISHEE *vs.*
MAUD S. WILLIAMS—MAUD S. WILLIAMS
*vs.* MERCHANTS' NATIONAL BANK.

*Pledge—Banker Holding Certificate of Stock Endorsed in
Blank as Security Not Authorized to Repledge
For His Debt—Trover—Measure of
Damages.*

When a certificate for shares of stock bearing an assignment and
power of attorney in blank, executed by the party in whose
name the certificate was originally issued, is delivered by the
owner to a banker to be held as security for a loan, the banker
has no authority to pledge such certificate for a loan to him-
self by a third party; and, since the endorsement in blank
only authorizes a sale and not a pledge, the owner of the shares
is not estopped to claim the same from the third party on the
ground that he clothed the banker with apparent authority
to pledge, but he is entitled to maintain an action of trover
against the third person, pledgee, by whom the shares were
sold.

The measure of damages in such case is the market value of the
stock at the time the banker made the unlawful pledge of it.

Conversion in the law of trover consists in the appropriation of
the property of another or in its destruction, or in exercising
dominion over it in defiance of the owner's rights, or in with-
holding possession under an adverse claim of title; and all
who participate in such unlawful acts are liable.

When shares of stock held as security for the general indebted-
ness of the owner to a banker have been wrongfully pledged
by the banker with a third person by whom they were sold,
then, in an action of trover by the owner against the third
person, the defendant is entitled to an allowance for the
amount of the owner's indebtedness to the banker.

*Decided March 23rd, 1909.*

Two appeals from the Superior Court of Baltimore City (ELLIOTT, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE and HENRY, JJ.

*W. B. Trundle* and *R. E. Lee Marshall* (with whom was *Arthur Geo. Brown* on the brief), for the Merchants' Nat. Bank.

Mrs. Williams never was the *legal owner* of the stock represented by the certificate in controversy, but had an *equitable title* only. The ownership and possession of the certificate gave her the *right* to become the legal owner of the stock, but this right could only be converted into a full legal title and ownership by causing the stock to be transferred to her on the books of the company. *Baltimore Brick Co.* v. *Mali,* 65 Md. 93; *Swift* v. *Smith,* 65 Md. 436; *Noble* v. *Turner,* 69 Md. 519; *Taliaferro* v. *First National Bank,* 71 Md. 214; *Kerr* v. *Urie,* 86 Md. 76-77.

The limited and qualified nature of the appellee's rights in and to the stock in controversy is most material to be considered. The only visible, tangible evidence in existence of her right or title to the stock, was the *actual possession* of the certificate. The certificate was in such form as to pass by delivery, so that the *mere possession* thereof, in whomsoever's hands, was the recognized and sufficient and only evidence of ownership in *the possessor*. The certificate itself contained no evidence whatsoever of any right or interest of the appellee, and hence, when she parted with the possession she not only destroyed all evidence of her own title, but she invested her transferee with as full and complete evidence of title and ownership as she herself had possessed.

Such being the nature of the appellee's rights arising out of the ownership of the certificate merely, it is obvious that her position is altogether different from that of a full legal owner of the stock.

In the latter case, the stock would have been registered on the books of the company in her name, the certificate would

have recited that *she* was the owner of the stock, and the power and authority of her brokers would have been derived from and limited by the terms of the power of attorney upon the certificate, executed by herself.

In transferring the certificate under these circumstances, she would have done so with notice to all the world that she, and not her transferee, was the owner of the stock, as well as of the certificate, and that her transferee had only such authority as the assignment and power of attorney in terms conferred upon him.

The neglect and failure of Mrs. Williams to perfect her legal title and become the legal owner of the stock represented by the certificate in controversy before delivering it to her brokers is the point upon which this case turns and which distinguishes it from the case of *Taliaferro* v. *First National Bank,* 71 Md. 200, and *German Savings Bank* v. *Renshaw,* 78 Md. 475, which were relied upon by counsel for appellee in the trial below and adopted by the Court as conclusive of this case.

The construction put upon these cases by the lower Court was, in effect, that the doctrine of estoppel has no application to cases of this kind in Maryland, or, to state it in different language, that the assignee or pledgee of a certificate of stock is to be charged absolutely, and in all events, with *knowledge* of the equities of former holders, regardless of the circumstances of the case.

But, it is respectfully submitted, the lower Court erred in holding that these cases announce any such principle so unique in itself and altogether opposed to the principle prevailing in most, if not all, jurisdictions outside of Maryland in such cases. While it is true that in the cases referred to, this Court differed with the Courts of other jurisdictions as to the legal sufficiency *of a given state of facts* to raise an estoppel, it was nowhere said or even intimated that an estoppel would not arise in favor of a pledgee or assignee of a certificate of stock as against the claims of the real owner in cases where the facts *are legally sufficient to justify it.*

On the contrary, the general doctrine of estoppel in such cases is as well settled in this State as everywhere else and rests upon exactly the same principle as in other jurisdictions.

"Certificates of stock are not negotiable instruments, and in the absence of elements of estoppel, a *bona fide* pledgee of a certificate from one who has no title, or authority to pledge the same, acquires no title or lien as against the true owner. But by reason of the equitable doctrine of estoppel, a *bona fide* pledgee of a certificate of stock from one whom the true owner has clothed with the apparent title, or with apparent authority to pledge the same, acquires a title or lien as against the true owner." 3 *Clark & Marshall on Corporations,* sec. 621; 4 *Ibid,* sec. 589.

"When a pledgee of certificates of stock, endorsed in blank, takes the certificates and sells or pledges them to another, who takes such certificates in good faith and for value, and without notice that his vendor, or pledgor, held them as a pledge, the purchaser, or pledgee, from the pledgee, is as fully protected in his rights as though the person with whom he dealt was the absolute owner of the stock. This rule arises not on the ground that the certificate of stock is negotiable, but for the reason that the owner is held to have enabled his pledgee to sell the stock as the pledgee's own, and that as between the owner and the *bona fide* purchaser, or pledgee, from the pledgee, the owner must bear the loss. The law of estoppel prevents his denying the right of his pledgee to sell, or pledge, as against a *bona fide* purchaser, or pledgee, from the pledgee. So also this principle arises under the well-established rule that when one of two innocent parties must suffer from the fraud of a third, the loss must fall on him who enabled the third party to perpetrate the fraud." 2 *Cook on Corporations,* (5th Ed.), sec. 473. See also *DosPassos on Stock Brokers,* 707-708; 1 *Purdy-Beach on Private Corp.* (1905), sec. 402; *France on Corporations,* pages 202, 320, 322; *McNeil* v. *Tenth Nat. Bank,* 46 N. Y. 325; *Holbrook* v. *New Jersey Zinc Co.,* 57 N. Y. 623; *Driscoll* v. *West*

*Bradley & Co.,* 59 N. Y. 105; *Gilbert* v. *Bldg. Assn.,* 184 Pa. St. 554; *Westinghouse* v. *German Nat. Bank,* 196 Pa. St. 249; *Shattuck* v. *Am. Cement Co.,* 205 Pa. St. 197; *Otis* v. *Gardner,* 105, Ill. 436; *Williams* v. *Fletcher,* 129 Ill. 363; *Mount Holly* v. *Ferree,* 17 N. J. Eq. 118; *Cherry* v. *Frost,* 75 Tenn. 1; *O'Mara* v. *Newcomb,* 38 Colo. 275.

What the Courts actually decided in the *Renshaw Case* and in the *Taliaferro Case* was that the pledgee banks in those cases could not invoke the doctrine of estoppel as against the claims of the real owners of the securities, because under the facts there presented, the banks were not *bona fide* holders of the securities for value *and without notice,* but on the contrary were charged with *such notice as, in law, amounted to actual knowledge* that their assignors were not the owners of the instruments.

In the first place, they were charged with *notice* of a want of title and authority in their assignors; and such notice, it was held, was imparted by the language of the powers of attorney, and by the face of the instruments themselves. "The very face of the instrument shows that it authorized the attorney to bargain and sell and transfer to blank, but not to pledge for debt. *Anyone taking this instrument must necessarily see this."* *Taliaferro's Case,* 71 Md., at page 208.

But it was not held that the *notice* so imparted, was, in and by itself, equivalent to *knowledge.* On the contrary it was held that in consequence of the notice the bank was put upon its inquiry, and therefore, that it was chargeable with all facts which an inquiry, if made, would have disclosed.

Giving the fullest force and effect to those cases, the most that they can, by any stretch of construction, be held to decide is that the pledgee of a certificate of stock is charged with such *notice* as should be gathered from the face of the certificate, or from the terms of the assignment, or of the power of attorney, and that when any *notice* of a defect of title, or want of authority in the assignor or pledgor is so imparted, an assignee, or pledgee, is charged with *knowledge* of all facts

which an inquiry into the facts so brought to his notice would disclose.·

Add to this that the assignee or pledgee must also pursue an inquiry· into any other collateral facts affecting the transaction *which are known to him,* and we have the full extent and measure of the obligation and duty resting upon the assignee or pledgee of a certificate of stock to make inquiry in respect to the right or title of his assignor.

Applying these principles to the case at bar, we find, in the first place, from the face of the certificate that Wilson, Colston & Co., were not the persons to whom the certificate was issued, but that it was issued to a certain Sternberger, Sinn & Co.

It also appears that Sternberger, Sinn & Co., sold and assigned the certificate in blank, and executed a blank power of attorney printed upon the certificate which conferred in terms a power to *sell* and not a power to *pledge.*

But what were the equities· of which the certificate in this case gave *notice,* and of which, if they existed, the appellant must be held to have had *knowledge,* under the rule in the *Renshaw* and *Taliaferro Cases?* Surely the equities, if any, of Sternberger, Sinn & Co., in whose name the certificate was issued, who had executed the assignment and power of attorney and who were registered as the owners of the stock represented by the certificate upon the books of the company.

Here, as in the *Renshaw Case,* the appellant was bound to inquire into any facts which might have aroused a suspicion that Wilson, Colston & Co., were exceeding their authority.

But even under the rule in the *Renshaw Case* the only suspicion, if any, which the facts could be held to give rise to, would be the suspicion, suggested by the form in which the certificate and power of attorney was made out, that the relation of principal and agent, or owner and attorney, existed between Sternberger, Sinn & Co., the apparent owners of the certificate, and Wilson, Colston & Co,

But inquiry as to this would have disclosed the fact that Sternberger, Sinn & Co. had *sold and delivered* the certificate

and parted with all rights of ownership therein on December 1, 1904, more than three years prior to the present transaction. Further inquiry, if any were necessary, would have shown that the vendee and transferee of Sternberger, Sinn & Co. had likewise sold and delivered the certificate, and that the certificate had passed from hand to hand by delivery through an unknown and unascertainable number of holders prior to coming into the possession of Wilson, Colston & Co., none of whom (with a single exception not material to mention here) had made a single entry or notation upon the certificate to evidence their right or title thereto, and none of whom had caused a transfer of the stock to be effected in his name on the books of the company.

The inquiry, therefore, suggested by the form of the certificate, and of the power of attorney, if it had been made, would have resulted in this: That the original owners of the certificate had put it in form to pass by delivery only, so as to vest ownership in a transferee, with the right to have the stock transferred on the books of the company, and in this form had actually sold and delivered the certificate *with the intention of parting with all control over it.* So far as they were concerned, therefore, any subsequent holder of the certificate would have had unrestricted power to deal with it by way of *pledge* as well as by *sale.* Furthermore, the certificate being in form to transfer a valid title by delivery only, the appellant had the right to presume (in the absence of anything to suggest the contrary) that a holder of the certificate had a valid title to it, as the owner thereof. It had the right to presume, therefore, and in point of fact it did presume, that Wilson, Colston & Co. were the owners of said certificate, as purchasers thereof in the usual course of business.

*George Weems Williams,* for Maud S. Williams.

We maintain, *First.* That the bank having received the stock in question, the certificate for which stood in the names of persons other than Messrs. Wilson, Colston & Co., under the assignment and power of attorney, above set forth, exe-

cuted in blank, and in terms only conferring a power to *sell*, was put upon inquiry as to the right of Messrs. Wilson, Colston & Co. to pledge it for their own debt, and this being so, the bank having taken it as collateral for a debt of Messrs. Wilson, Colston & Co., acquired no better title thereto than that firm.

*Second.* That if the bank acquired no better title than its pledgor to the stock, Mrs. Williams is entitled to damages for its conversion, its return having become impossible by the sale by the bank and transfer thereof on the books of the Wabash Railroad Company.

*Third.* That the true measure of damages in a case of this kind is the value of the stock on the date upon which it is without authority pledged, and thereby converted with interest from said date, there being no indebtedness due by the owner thereof to the pledging broker upon a proper settlement of accounts between them.

These propositions are amply sustained by *Taliaferro* v. *Bank,* 71 Md. 209; *Bank* v. *Taliaferro,* 72 Md. 169; *German Savings Bank* v. *Renshaw,* 78 Md. 475.

In the case at bar the Wabash stock stood not in the name of Messrs. Wilson, Colston & Co., but in the name of another firm, and the assignment and power of attorney did not in terms or by any possible construction thereof authorize anybody to pledge the same, and yet the bank made no inquiry, either of the pledging brokers as to who owned the stock or their rights in the same, or of the firm in whose name the stock certificate stood. If, in the *Taliaferro Case,* the fact that the securities stood in the names of the plaintiffs therein and the terms of the power of attorney were declared sufficient to put the lending bank on inquiry, how can it be argued that the facts in the case at bar, including the assignment and power of attorney, were insufficient to put another lending bank on the same inquiry? If the bank in the case at bar had asked Messrs. Wilson, Colston & Co. whether they owned the Wabash stock or what their rights were in the same, no one can contend either by reasoning or in any other way that it

would not have received absolutely accurate answers to their inquiries. We are sure that the contrary will not be argued; but, if it is, the contention must be that the bank's inquiries in this direction would have been unavailing, and that as a matter of law it is to be presumed that such inquiries, if they had been made, would have brought forth misrepresentations. If the bank had questioned Sternberger, Sinn & Co., the New York brokers, in whose name the stock stood, as to whether they had authorized Messrs. Wilson, Colston & Co., to pledge the same for a debt of the latter firm, we cannot assume that their answer would have been in the affirmative, and, therefore, not in accord with the real facts. It does not appear that the bank made any inquiry whatsoever, and, therefore, it is unneccessary to speculate what results such an inquiry would have accomplished, unless we are willing to assume that their inquiry would have been unavailing upon the further unjustifiable assumption that the persons who should have been interrogated would have misrepresented the real facts.

From the facts in the case at bar it is too clear for argument that neither Mrs. Williams nor her husband ever delivered the Wabash stock certificate to Messrs. Wilson, Colston & Co., with any authority to pledge the same for their own debts. The correspondence shows that the only right the brokerage firm had in this stock was to *hold* the same together with other securities as collateral for the debt of Mr. Williams. Mrs. Williams was the owner of the stock, and her husband with her consent placed it as collateral with this firm, which not only did a brokerage business, but were *bankers*. If Mrs. Williams or her husband had bought a large block of stock on *margin* through a stock brokerage house, it could be argued with some force and justice that persons dealing on margins in large amounts should be charged with knowledge that ordinarily stock brokers cannot on account of the limitations of their capital buy large blocks of stock out of their own resources, but must of necessity resort to rehypothecation in order to finance transactions of such a char-

acter. In the case at bar, however, we do not have presented
a margin transaction, but simply an increase of Mr. Williams'
debt to his bankers of a little over two hundred dollars, in
order that the Wabash stock might be taken up with the un-
derstanding that the certificate for that stock thus taken up
should be held by his bankers with other collateral in their
possession as additional security.

If the bank had made the proper inquiries as to those mat-
ters upon which it was by law put upon inquiry, a loan would
never have been made by it upon the stock of Mrs. Williams
as part security. It, however, took the risk of lending upon
securities which its debtor had no right to pledge, and which
were in such condition as put it upon inquiry, and if it has
thereby suffered a loss it is no fault of the owner of the stock.

The measure of damages is the market value of the stock
at the date of the conversion, with interest thereon to the date
of the trial. *Baltimore Marine Ins. Co.* v. *Dalrymple,* 25
Md. 304; *Poe's Pleading,* 4th Ed. 66, 219.

In the case at bar the conversion took place on the date of
the unauthorized pledging of the stock, which was September
17, 1907, for on that date the bank took the stock with con-
structive knowledge of the plaintiff's rights in it.

In the *Bank* v. *Taliaferro,* 72 Md. 164, this Court affirmed
the ruling of the lower Court in granting the plaintiff's second
prayer therein, which instructed the jury that if their verdict
was for the plaintiff, the amount thereof "must be for such
sum as the jury may find was the value of the bonds or cer-
tificates of indebtedness spoken of in the evidence, together
with the value of the coupons attached thereto *at the time of
the taking of the same by the defendant* with interest on said
sum to the time of the rendition of the verdict." The "time
of the taking" of the securities in that case by the defendant
bank was when Veazey pledged them with the bank.

In *Renshaw's Case,* the plaintiff's first prayer, which was
practically conceded, declared that the true measure of dam-
ages was the market value of the stock when it was pledged
by the brokers with the bank.

In the case at bar, the learned Court below ruled that the measure of damages should be based on the market value of the Wabash stock not on the day it was pledged with the bank, but on the date it was sold by the bank, a difference of about four hundred dollars, and therefore granted the defendant's fifth prayer and rejected the plaintiff's prayers on the subject.

The Court also ruled in granting the defendant's fifth prayer, that the sum of $216.45 borrowed by Mr. Williams to enable Mrs. Williams to take up the stock should be deducted. This is contrary to the ruling of this Court in *Renshaw's Case,* and we, therefore, urge that the defendant's fifth prayer should have been refused and that the plaintiff's sixth and seventh prayers, which are based on propositions that are in our opinion sustained by the case just cited, should have been granted.

BURKE, J., delivered the opinion of the Court.

Mrs. Maud S. Williams, the plaintiff, who is the wife of Henry Williams, an officer in the United States Navy, purchased on April 19th, 1906, through the New York stock brokerage firm of Buckout, Davis & Co. 100 shares of the common capital stock of the Wabash Railroad Company, a body corporate, at twenty-one dollars per share, and paid on account of said shares one thousand dollars. Prior to June 4th, 1907, she made another payment on account thereof of over eight hundred dollars. This stock was represented by a certificate, and that certificate was delivered by Buckout, Davis & Co. to her on June 14th, 1907. This stock certificate was in the ordinary form, and was issued to Sternberger, Sinn & Co., and certified that they were entitled to one hundred shares of the common capital stock of the Wabash Railroad Company, and that the stock was transferable in person, or by attorney, only on the books of the company in New York upon the surrender of the certificate.

Mrs. Williams owed the New York brokers a balance of two hundred and sixteen dollars and forty-five cents on ac-

count of this stock, and on June 4th, 1907, Henry Williams, her husband, who was a customer of Wilson, Colston & Co., bankers and brokers of Baltimore, wrote to that firm advising them that Mrs. Williams was carrying this stock and that she desired him to take it over; that it would require between two hundred and two hundred and fifty dollars to do so, and asking if they would be willing to allow him to overdraw his account to the extent required and to carry the stock for him on that margin, stating further that if that was agreeable he would draw his check on them for the necessary amount, and that the securities they held in his name should be amply sufficient to cover the draft, and that as soon as he could obtain the certificate he would forward it to them to hold against his debit account, together with the other securities.

Wilson, Colston & Co. agreed to this proposal, and on June 12th, 1907, Mr. Williams drew a check on that firm to the order of the plaintiff for two hundred and sixteen dollars and forty-five cents, being the balance due on the purchase price of the stock, which check she endorsed and delivered to Buckout, Davis & Co. This check was paid by Wilson, Colston & Co. and charged to the account of Henry Williams. On June 15th, 1907, Mr. Williams sent the stock certificate to Wilson, Colston & Co. to be held by them along with other securities belonging to him in pursuance of the understanding and agreement contained in the correspondence to which we have referred. In his letter transmitting the stock he states that it "is the property of Mrs. Maud S. Williams, and should be held subject to her order in case of my absence or demise."

The stock certificate contained the following blank assignment and powers of attorney endorsed on the back thereof:

"For value received          have bargained, sold, assigned and transferred, and by these presents do bargain, sell, assign and transfer unto          the capital stock named in the within certificate, and
do hereby constitute and appoint Henry Sproul & Co. true and lawful attorney irrevocable, for
and in          name and stead, but to          use, to

sell, transfer, assign and set over all or any part of said stock and for that purpose to make and execute all necessary acts of assignment and transfer, and one or more persons to substitute with like full power.

Dated December 1 1904.          STERNBERGER, SINN & Co.

Signed and acknowledged in
the presence of
A. GUEST.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

We hereby irrevocably constitute and appoint Whitehouse & Co. our substitute to transfer the within named stock under the foregoing power of attorney, with like power of substitution.

Dated September 28, 1905.              HENRY SPROUL & Co.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

We hereby irrevocably constitute and appoint R. J. Montgomery substitute to transfer the within named stock under the foregoing power of attorney, with like power of substitution.

Dated March 2nd, 1908.              WHITEHOUSE & Co."

On September 17, 1907, Wilson, Colston, & Co. borrowed for their own use and benefit ten thousand dollars from the Farmers and Merchants' State Bank of Fredericksburg, Va., which bank acted through the Merchants' National Bank of Baltimore as its agent, and pledged, among other collateral to secure said loan, the Wabash stock belonging to Mrs. Williams, and which had come into their possession under the circumstances mentioned. Wilson, Colston & Co. thereafter became insolvent and receivers were appointed to take charge of the affairs of the firm, and on the 29th of February, 1908, the Merchants' Bank acting for the Fredericksburg Bank sold the Wabash stock for seven hundred and eighty-seven dollars and fifty cents, and applied the proceeds to the loan made by the Fredericksburg Bank to Wilson, Colston & Co., and on or about the 2nd day of March, 1908, the certificate was cancelled on the books of the Wabash Railroad Company, and new certificates for one hundred shares represented by said certificate were issued by that company, to wit, a certificate of twenty shares to Tracey & Co.; and a certificate of eighty

shares to DeCopet & Doremus. Neither Mr. nor Mrs. Williams had any knowledge of the loan by the Fredericksburg Bank to Wilson, Colston & Co. until sometime after the failure of that firm, and believed, until after the failure, that the stock was held by them and was in their actual possession.

Wilson, Colston & Co., from a date prior to June 14th, 1907, had in their possession a certificate, or certificates for thirteen shares of the common capital stock of the Baltimore and Ohio Railroad Company belonging to Henry Williams, but standing in the name of Wilson, Colston & Co., until November 7th, 1907, at or about which time that firm, pledged said stock, with other securities, as collateral for loans made to that firm for their own benefit by other banks other than the defendant, and after the receivership of the firm of Wilson, Colston & Co., the banks with which said stock had been pledged, sold the same. The market value of the Wabash stock was from 11½ to 11¾ dollars per share on September 17th, 1907, when it was pledged with the defendant, and on February 29th, 1908, when it was sold by it the stock was worth 7⅝ dollars per share.

It is a universal custom among banks and bankers in the city of Baltimore to require, from stock brokers offering stock as collateral for loans made to them, an express power of rehypothication properly executed by the owner of such stock, whenever it appears on the face of the certificate that the stock was originally issued, or was at any time transferred, to any individual, firm or corporation, other than a bank, or broker; but "street certificates," that is to say, certificates issued in the name of bankers or brokers, are customarily transferred, sold or pledged by endorsement in blank and delivered, as in the case of the certificate above set forth, and without an express power of hypothecation or rehypothecation. This custom has grown out of the usual manner of conducting the stock brokerage business in accordance with which certificates of stock issued to, or standing in the name of bankers or brokers are treated as the property of such bankers or brokers so far as the power to sell, pledge or hypothecate

the same is concerned, and certificates of stock standing in the names of persons other than brokers or bankers are treated as the property of such persons and subject to their direction and control.

Neither the Farmers & Merchants' State Bank, nor the Merchants' National Bank at the time of the pledge of the stock by Wilson, Colston & Co. had any *actual* knowledge of the existence of either Mr. or Mrs. Williams, or any right, interest or claim of either in or to the 100 shares of the Wabash stock, or any part thereof. It is contended by the plaintiff that, excluding the value of the Wabash stock in question, the firm of Wilson, Colston & Co. at the date of its failure, was upon a correct accounting in Mr. Williams' debt.

On March 12th, 1908, Mrs. Williams sued out a non-resident attachment against the Farmers & Merchants' State Bank of Fredericksburg and laid the same in the hands of the Merchants' National Bank of Baltimore. The Virginia Bank did not appear to the short note case; but the Merchants' Bank, as garnishee, appeared and filed a plea of *nulla bona* in its own behalf, and the general issue pleas in behalf of the Fredericksburg Bank, and issue was joined. It was subsequently agreed that the garnishee bank, at the time the attachment was laid, had and still has in its possession funds, or property belonging to the Virginia Bank and subject to attachment of at least thirteen hundred dollars. All errors of pleading were waived. The case was tried before the Court, without a jury, and resulted in a verdict and judgment for the plaintiff, and both parties have appealed.

These appeals present two questions: first, can the plaintiff, upon the facts stated, recover against the Merchants' Bank the value of the 100 shares of Wabash stock which belonged to her and which were pledged by her husband to Wilson, Colston & Co. under the circumstances stated, and by that firm repledged for their own account to the Fredericksburg Bank? If she can recover, what is the true measure of damage? The Court below held that she could recover, and it

also held that the 29th of February, 1908, being the date on which the stock was sold, should be treated as the time at which the value of the stock could be ascertained. It is these rulings that form the subjects of the respective appeals.

It is contended by the Merchants' National Bank, as garnishee, that Mrs. Williams cannot maintain this suit because, upon the facts stated, she is equitably estopped to assert her claim to the stock. It is argued that by the delivery of the certificate of stock to Wilson, Colston & Co., with the blank assignment and powers of attorney in the form set forth, she thereby clothed them with the *indicia* of ownership, and that having by that act enabled them, as apparent owners, to obtain money thereon, in the usual course of business from a holder for value without notice of her interest in the stock, she is estopped to show that the apparent owner is not its real owner. This proposition, which constitutes the main ground upon which the bank relies to defeat a recovery, is predicated upon two assumptions: first, that Wilson, Colston & Co. was clothed by the plaintiff with an absolute *prima facie* ownership of the stock; and secondly, that it took the same as security without notice of her rights therein.

The soundness of this proposition depends upon the nature and legal effect of the blank assignment and powers of attorney endorsed upon the certificate. It is definitely settled in this State that such an assignment and such powers of attorney do not clothe the broker with whom the stock has been pledged with the *indicia* of absolute ownership, and further that such endorsements give no right to the broker to pledge the security for his own debt, and that anyone who accepts the stock as security for a loan to the pledging broker is chargeable with full notice of the rights of the real owner, or original pledgor.

In the case of the *First National Bank* v. *Taliaferro,* 71 Md. 200, in which the Court considered the legal effect of a blank assignment and power of attorney substantially like the one in this case, it was held that by no possible construction could it be regarded as conferring authority upon one to

whom they were delivered to hypothecate the securities for his own debt, and that the bank was chargeable with notice of the limited authority imposed by the power of attorney, and consequently did not acquire any title to the securities against the rightful owner.

The assignment and power of attorney in the *German Savings Bank* v. *Renshaw*, 78 Md. 475, were identical in form with those contained in this record. In that case Renshaw sued the bank in *trover* to recover the value of 200 shares of second preferred stock of The East Tennessee, Virginia, and Georgia Railroad which had been pledged as collateral with Nicholson & Sons, and which they had repledged to the bank, together with other securities, for a loan of fifteen thousand dollars made by the bank to them. In the course of the opinion in that case, it is said: "The nature of assignment and powers of attorney, such as exist here, were fully considered in the case of *Taliaferro* v. *The First National Bank of Baltimore*, 71 Md. 209. There Miss Taliaferro intrusted her bonds to Veazey *for sale*, with assignments and powers of attorney executed in blank, in all respects like those under which the appellant now claims, and it was held, that by no possible construction could such powers be regarded as conferring authority upon Veazey to hypothecate the bonds as security for his own debt; that the bank took them "with no better title than Veazey himself possessed, and was charged with notice of such facts and matters as made it reasonable that inquiry should be made into such titles." See also *First National Bank of Baltimore* v. *Taliaferro*, 72 Md. 169. Applying this rule to this case, it follows, that having received this stock under these assignments, executed in blank and conferring only a power to sell, the appellant was put upon its inquiry as to the right of the Nicholsons to pledge it for their own debt, and must therefore be charged with full notice of the contract by which they held it."

The cases relied upon by the Merchants' Bank in support of the doctrine of equitable estoppel, among which are the cases of *McNeil* v. *The Tenth National Bank*, 46 N. Y. 325,

and *Shattuck* v. *The American Cement Company,* 205 Pa.
St. 197, are quite distinguishable in their facts from the case
in hand. They all rest upon a familiar principle that where
the real owner invests another with all the indicia of absolute
ownership, and thus induces an innocent third person, with-
out actual or constructive notice, of the want of power in the
possessor to sell or pledge, he cannot against such bona fide
purchaser for value without notice assert a claim to the prop-
erty. *Lester* v. *Allen,* 31 Md. 548; *Eversole* v. *Maull,* 50
Md. 106;*Levi* v. *Booth,* 58 Md. 312. In the *McNeil and
Shattuck Cases, supra,* the blank assignments and powers of
attorney were absolute and unrestricted, and the principle of
equitable estoppel, upon the facts of those cases, might have
been well applied. We find nothing in the New York Cases
in conflict with the doctrine declared in the *Taliaferro and
Renshaw Cases, supra.*

The certificate of stock by its terms was "transferable in
person, or by attorney only on the books of the company in the
City of New York," upon the surrender of the certificate.
Mrs. Williams, is conceded by the defendant to be the equit-
able owner of the certificate of stock, but she never in fact
had the transfer made upon the company's books, and because
of this omission, it is contended that she cannot maintain this
suit. This Court in the case of the *Bloede Company* v.
*Bloede,* 84 Md. 141, said that: "The entry of the transfer on
the books of the company is required, not for the translation
of the title, but for the protection of the parties and others
dealing with the company; and to enable it to know who are
its stock holders entitled to vote at meetings and to receive
dividends when declared." As against everybody but the cor-
poration itself, and those who have a superior right to have
the corporation make the transfer to them, Mrs. Williams
was the real owner of the stock, and entitled to sue at law for
its possession. 10 *Cyc.,* 599.

The remaining question relates to the rule of damages to be
applied. Conversion, in the sense of the law of trover, con-
sists either in the appropriation of the property of another,

or in its destruction, or in exercising dominion over it in defiance of the owner's rights, or in withholding the possession from him under an adverse claim of title, and all who aid, command, assist, or participate in the commission of such unlawful acts are liable. In this case the bank, accepting for its own benefit, the stock from Wilson Colston & Co., with notice of their want of authority to hypothecate, became by that act jointly liable with that firm for the conversion of the plaintiff's goods, which took place on the 17th of September, 1907. The general rule is that in an action of *trover* the plaintiff is entitled to recover the value of the converted chattels at the time of the conversion, with interest thereon to the date of the verdict. *Sterling* v. *Garritee,* 18 Md. 468; *Bonaparte* v. *Claggett,* 78 Md. 105.

We see no good reason why a date different from that whereon the actual conversion took place should be selected as the time for ascertaining the value of the stock.

This stock was pledged not for $216.45 only, the amount required by Mrs. Williams to complete her purchase, but also for the general debit account of Mr. Williams with the firm of Wilson, Colston & Co., and therefore, the defendant is entitled to have deducted such amount, with interest, to date of trial as Mr. Williams may owe that firm. If Mrs. Williams has accepted the dividend mentioned in the evidence this also should be deducted from her claim.

We agree with the rulings of the learned Judge in the lower Court, except as to the measure of damage which he applied to the case. He held, in granting the defendant's fifth prayer, that the 29th of Februray, 1908, should be treated as the date at which the value of the stock should be ascertained, and against that value with interest to the date of trial he allowed a credit of $216.45 with interest thereon from June 12th, 1907, to February 29th, 1908. If neither Mr. nor Mrs. Williams was indebted at the time of trial to Wilson, Colston & Co. it was a manifest error to deduct any sum from her claim.

For this error the judgment will be reversed, and the case remanded for a new trial.

> *Judgment reversed, and the case remanded for a new trial, the Merchants' National Bank, Garnishee, to pay the costs.*