## In re ARCHER, HARVEY & CO.

### (District Court, D. Maryland. April 24, 1923.)

1. **Bankruptcy ⬿140(3)—Rights of customers in securities pledged by brokers.**

   On bankruptcy of a broker, who, without express authority, has pledged securities deposited with him by customers, some to secure indebtedness, and some not, those customers who were indebted, but whose securities were pledged for more than their indebtedness as to the excess are in the same class as customers owning pledged securities who were not indebted.

2. **Bankruptcy ⬿140(3)—Recovery by customers of stock held by broker.**

   Each customer of a broker, from whom he had received or for whom he had purchased a particular stock, of which he was short when adjudged bankrupt, is entitled to recover his pro rata share of such stock traced to the trustee, but no more, the share of others, not claimed in specie, being general assets of the estate, and the same rule governs as to the bankrupt's equity in such of the stock as he had pledged without authority.

3. **Bankruptcy ⬿140(3)—Customers' stocks, pledged by broker for his own debt, must contribute pro rata to its payment.**

   Where a broker before bankruptcy, without authority, had pledged stocks belonging to customers for his own indebtedness, the fact that the pledgee recovered its debt by sale of certain of the stocks and returned the others to the trustee, does not entitle owners of the returned stocks to any preference over the owners of those sold, but all stocks pledged for the debt must contribute pro rata to its payment.

4. **Bankruptcy ⬿140(3)—Rights of owner of stock wrongfully pledged by broker.**

   The owner of stock wrongfully pledged by a broker before his bankruptcy to secure money borrowed by him at the time cannot be required to contribute to the payment of prior indebtedness of bankrupt to the pledgee fully secured by other pledges.

5. **Bankruptcy ⬿140(3)—Relative rights of claimants of stocks wrongfully disposed of by brokers.**

   Petitioners, who were engaged with brokers in a joint dealing in securities, the business to be conducted by the brokers, who were authorized to sell the securities, *held* not entitled to share in securities, of the same kind on hand when the brokers became bankrupt, which were insufficient to meet the claims of customers whose securities of the same kind bankrupts held with no right to dispose of them.

6. **Bankruptcy ⬿140(3)—One who became creditor of bankrupts through mistake held to have no equity to require payment from property held, but not owned, by bankrupts.**

   Petitioner bank, which received securities, with draft attached, for delivery to bankrupts, who were brokers, through mistake or inadvertence, accepted an uncertified check in payment and delivered the securities for which bankrupts collected from their customer and deposited the money in the bank on which the check was drawn. Before the check was presented, bankrupts failed and the bank on which it was drawn applied bankrupts' deposit on an indebtedness to it, secured by pledge of securities owned by a customer of bankrupts, and which they had no right to pledge. This payment released pledged securities pro tanto, which were returned to the trustee, but in which he had no interest. *Held*, that petitioner had no equity against the returned securities for payment of its claim on the check.

In Bankruptcy. In the matter of Archer, Harvey & Co., bankrupts. On consideration of several petitions for reclamation of property.

Janney, Ober, Slingluff & Williams, Piper, Carey & Hall, and Harley & Wheltle, all of Baltimore, Md., for various creditors.

Edward Duffy, of Baltimore, Md., for trustee.

ROSE, Circuit Judge. Archer, Harvey & Co., the bankrupts, were stockbrokers. The problems to be solved are the result of the firm's having proven false to its trusts, in that it took for itself securities which belonged to others. In varying degrees, a similar state of things exists in a distressingly large proportion of all brokerage failures. We all have intimate friends and acquaintances among the brokers. We know they are as trustworthy, upon the average, as the rest of us. What is the matter with the mechanism of a business in which, under pressure, so many theretofore good men go so woefully wrong? Those who are in it should be best qualified, not only to answer the query, but to apply corrective measures through their exchanges. Laws, regulations, and good bookkeeping do not make men honest, but they can help greatly to keep them so.

In the instant case, the petitions now under consideration seek to assert rights of ownership in particular securities which at the time of the bankruptcy were held by pledgees of the bankrupts for loans made to the latter. The courts have had much difficulty in laying down and applying the rules which should govern under such circumstances. The variance in the views of courts of different states as to the fundamental legal relation between a stockbroker and his customers have sometimes led even a federal court to one conclusion when the broker shop was in Boston, and to another when, under precisely the same circumstances, the trading was done in New York. In re Codman (D. C.) 284 Fed. 273. In an effort to formulate logical theories under which some measure of redress may be given long customers, the courts have resorted to certain presumptions which usually have little existence in fact, as Judge Hough has forcibly pointed out. In re Hollins (D. C.) 212 Fed. 317.

Legal fictions are often useful and sometimes necessary; but when we agree to close our eyes to realities, we are always in danger of getting into that tangled web which proverbially enmeshes those who practice to deceive, perhaps even if it be only themselves, and then to a good end. Perhaps, however, the chief cause of the apparent logical inconsistencies in the utterances of the appellate courts is that they have been compelled to deal with this class of cases in piece meal fashion. The record as it came to them seldom justified and never required them to go into the accounting problems essential to a full adjustment of the conflicting rights and equities of all the parties concerned. They dealt with the particular issues raised by those before them, and in giving the reasons for such decisions as they might make, they usually were not thinking about anything else, and were therefore not careful to guard what they said against the possibility of misunderstandings when there was occasion to apply what appeared to be its logic to a different state of facts. See Pippey's Appeal, In re McIntyre, 181 Fed. 955, 104 C. C. A. 419 and the subsequent com-

ments upon it in Re Wilson & Co. (D. C.) 252 Fed. 631 and in Re Toole (C. C. A.) 274 Fed. 337.

[1] In the case now at this bar, most, if not all, the petitioners owed the bankrupts greater or less sums, and the securities in which they are now trying to assert rights were delivered to the bankrupts or left with them to protect this indebtedness. It does not appear that any of the petitioners gave the bankrupts any express authority to rehypothecate their securities, and any implied power to do so, was, of course, limited to the amount of the bankrupt's advances to them. Any pledging beyond that amount was wrongful, as was any hypothecation at all of the securities owned of the persons who were not indebted to the bankrupts. Under the circumstances of this case, it seems at once just and practically expedient to treat the petitioners whose securities were pledged for a greater amount than that for which the bankrupts had any right to burden them as being as to such excess, but as to that only, in the same class with those whose securities had been hypothecated, although they owed the bankrupts nothing. In re Wilson & Co., Goodman's Claim (D. C.) 252 Fed. 631; In re Bolling, 147 Fed. 786, affirmed in Kean v. Dickinson, 152 Fed. 1022, 82 C. C. A. 667.

[2] When the crash came, the bankrupts were short of various kinds of securities; that is to say, the sum of such securities in their box, plus those pledged by them, was usually less than the total which their books showed belonged to their customers. For example, according to the bankrupts' books, A., B., C., and D. may have been each entitled to 100 shares of X stock. The bankrupts, had none of such in their box, but they did have 200 shares pledged on a loan to the K. Bank. A. and B. have each filed petitions alleging themselves to be the owners of 100 shares of that stock, and claiming it. C. and D. have done nothing other than to put in claims as general creditors, without setting up any title to any specific shares, although the time limited by order of the court for so doing has long since expired. The trustee contends that A. and B. are entitled to but one-quarter each of the stock which in any sense survived bankruptcy; that is to say, 50 shares each, of rather to any surviving equity there may be therein after the payment of the sums due the pledgee. A. and B. answer that if, for the purpose of this case, it be assumed that they each could claim but 50 shares held by the pledgee, they are at all events clearly entitled to have any shares belonging to the bankrupts, or which, although not owned by the bankrupts, were rightfully pledged by the latter and in the hands of the pledgee, first applied to the payment of the debt before their stock can be called upon for contribution. In re Hollins & Co., 232 Fed. 124, 146 C. C. A. 316. If no one other than the bankrupts claim the 100 shares, which possibly or probably might have been claimed by C. and D., either those shares remain the bankrupts' property or were rightfully pledged by them, and must be first applied to the extinguishment of the bankrupts' debt to the pledgee. As the accounts actually work out in this case, petitioners, who are in the situation of A. and B., are content to be dealt with upon the theory last stated, without raising the question whether they are or are not entitled to assert that, there being 200 shares unclaimed by

others than themselves, and that being precisely the amount due them, they are entitled each to his 100 shares, or rather to the equity therein.

The first reported case in which a similar question arose appears to have been In re Hollins (D. C.) 212 Fed. 317. There the bankrupt should have had in his possession 280 shares of copper belonging to D., W., L., and B., in the proportions of 100, 50, 100, and 30 shares, respectively. The bankrupt, in point of fact, had in his box only 100, 80 more were pledged for loans, and 100 were due by a short customer. D. and W. claimed to be entitled to $^{100}/_{280}$ and $^{50}/_{280}$, respectively, of the 100 shares in the box. B. submitted his rights, claiming whatever relief was accorded W. L., although notified, did not put in a claim of any kind. At the time of the failure, each of these four persons had other securities in the possession of the bankrupt, and each of them owed him considerable money. B. had, in fact, never paid anything directly on his 30 shares, although the price was secured, or had been, by the 30 shares and other property of his under the bankrupts' control. He was not willing to pay for the shares, and no order was made as to his rights or as to those of L. Each share was taken to be worth at the time of the bankruptcy $80⅛, so that the total value of the 100 shares in the bankrupts' box was $7,012.50. Of these, D. was awarded $^{100}/_{280}$, or 35.714 shares, and W. $^{50}/_{280}$, or 17.857 shares, so that of the $7,012.50, or its equivalent, due D., and the $3,506.25, due W., they received in stock or in money $2,504.44 and $1,252.22, respectively. The bankrupts owed them the difference or $4,508.06 and $2,254.03, respectively. These sums they were held entitled to set off against their net indebtedness to the bankrupts' estate after the liquidation of their other securities. So far as is possible to make out from the facts stated in the report, this setting off extinguished all the indebtedness, and left D. a general creditor in the amount of $1,182.05 and W. in the amount of $1,963.06. This decree, after having been reversed by the Circuit Court of Appeals in 219 Fed. 544, 135 C. C. A. 312, on the ground that the 100 shares in the box were not sufficiently identified as the property of the claimants, was in Duel v. Hollins, 241 U. S. 523, 36 Sup. Ct. 615, 60 L. Ed. 1143, affirmed by the Supreme Court, overruling the decision of the Circuit Court of Appeals. In the Circuit Court of Appeals and in the Supreme Court, the only question discussed was as to whether the claimants had sufficiently earmarked or traced the certificate in the box to give them any rights in it.

Before attempting to apply what was there done to the question now in hand, it should be noted that the case does not deal or attempt to deal with anything but the 100 shares. D. and W. were entitled to their $^{100}/_{280}$ and their $^{50}/_{280}$, respectively, in the 80 shares that were pledged, or in the equity in such 80 shares after the payment of the loan for which they were bound, and in any claim against the short customer for 100 shares, so that apparently there were in some form or other in existence enough shares to go around; but that fact seems to have been ignored, perhaps because these theoretical rights were in fact valueless. None of the reports tell us what was done in the final statement of accounts with the proceeds of 46.429 shares out of the

100 which were worth $3,243.34. If this decision might therefore be thought to leave the particular point in which we are interested somewhat in the air, there is no question as to the construction the Circuit Court of Appeals of the Second Circuit put upon it. In May, 1916, less than a month before the opinion in Duel v. Hollins was handed down, the Circuit Court of Appeals of the Second Circuit had had before it In re Pierson, 233 Fed. 519, 147 C. C. A. 405. Various persons made claims for specific securities. The case of Van Thyn is typical. He asked for 100 shares of Central Leather. When the failure took place, he owed the bankrupt $1,253.40. On that day, there were hypothecated with the banks 335 shares of Central Leather, which covered all purchases of customers who were long. When the loans were closed out, the banks returned 235 shares to the receiver. After Duel v. Hollins was decided, the Circuit Court of Appeals granted a rehearing, as a result of which (In re Pierson, 238 Fed. 142, 151 C. C. A. 218), it directed that Van Thyn and others in like case with him, should be permitted to recover their pro rata portions of the stock on hand, but said their shares—

"must be ascertained by including in the calculation the shares of all long customers in the same position, whether they made claim for their shares in the stock on hand or not. That the shares of those who claim should be increased by the circumstances that other long customers made no claim would be inequitable. What would otherwise have gone to those customers should go to the general creditors."

In Judge Mayer's exhaustive opinion in Re J. C. Wilson & Co. (D. C.) 252 Fed. 631–653, he says:

"Where claimants have failed to prove their claim to the pro rata of Ray Consolidated, such failure cannot enlarge the pro rata of those who have traced."

It is very doubtful whether there was any intention in the Circuit Court of Appeals for the Second Circuit, in Re B. Solomon & Co., 268 Fed. 108, to reconsider the rule. The question there was one of identification. All the court said was:

"We are also unable to say whether the 4,000 shares of Tuxpam stock, which the receiver admits he found when he took possession, were the identical shares which were originally turned over as the property of the claimant; but, as no one else is claiming them, it is not important whether they are or not."

All the facts in the case seem to show that this was the only Tuxpam stock that anybody had the right to claim.

The only other express support which the petitioners have been able to find is the recent and very able and thorough report of Mr. Ralph D. Quinter, a special master in the Supreme Court for the District of Columbia (In the matter of Moorhead & Ellmore, Bankrupts, Washington Law Reports, November 24, 1922), and the expression of an opinion to that effect by Mr. E. Irving Smith, in his article on Margin Stocks in 35 Harvard Law Review, 485. Both these gentlemen base their conclusion upon what seems to me to be a misconception of the significance of an apparently chance expression in Re Solomon, supra, and on what each of them believed to be the more logical doctrine. They are obviously men of ability and have given much thought to the

question. Nevertheless I understand that the practice in the Second Circuit is in accordance with what was decided in Re Pierson and in Re Wilson & Co., supra, unaffected by anything that was said in Re Solomon.

The practical importance of having a fixed and uniform rule in these cases is great. There is more frequent occasion to apply it in New York than anywhere else. There is therefore more than the ordinary reason why a District Court should accept the view taken by the Circuit Court of Appeals of another circuit. Besides, much can be said for the essential fairness of the practice there prevailing. Under it, each claimant gets all to which he is entitled. That something which might otherwise be taken for the exclusive use of a rival claimant actually goes to all the creditors is really to the advantage of the petitioner, in that it increases the fund upon which he will be entitled to go for a dividend for so much of his claim as is unsecured. It is true that he has the right, before his securities can be called upon to contribute to the debt for which they were pledged, to require the application to that pledge of everything which belonged to the bankrupt and which was pledged with the claimants. But, is there not more of theory than substance in the assumption that the unclaimed property must be treated as if it had been the bankrupts' at bankruptcy merely because another customer in like class with petitioner does not, after bankruptcy, claim what such other was entitled to? There would seem to be nothing to recommend it, except a certain formal logic which it has or seems to have. Moreover, is there any reason why the courts should put a premium upon filing preferential claims? When made, they must be respected; but, as a rule, are not the superior rights so asserted almost always the result of accident or chance? In the long run, would not as high a degree of equity be worked out, if all the customers of the bankrupt brokers shared equally in their assets, and that, too, with infinitely less of trouble, delay, and expense.

In stating the accounts in this case, each of the petitioners who has a claim for a portion of any security or for the surplus remaining after the payment of the debt for which it in common with others has been pledged, must be treated as the owner of that proportion; but he is not to benefit by the fact that other persons, having equal rights with him to share in that security, have made no claim therefor. The proportion of the security or the equity therein to which such others are entitled, are to go to the bankruptcy trustee for the benefit of the general creditors, not because at bankruptcy they were the property of the bankrupt, but because, after the bankruptcy, those to whom they belonged preferred to allow them to become a part of the property to be equally distributed among all the creditors.

*Claim of Mrs. Ricker.*

A claim which presents some unusual features is that of Mrs. Ricker. This lady, who is employed in a clerical capacity in Baltimore, is largely dependent on her own exertions for her support. She was, at the time of the transactions in question, helping her brother to get his medical education at the Medical School of the Johns Hopkins University. For that and other purposes she had need of a few hundred dollars. She owned 75 shares of stock of the Anaconda Copper Co.,

which, unfortunately for her, were all represented by a single certificate. She made up her mind to raise the money she needed by a sale of 15 shares of this stock. She had a slight acquaintance with the Archer family, and therefore, for that reason, went to the bankrupts' office to get Mr. Archer to sell the stock for her. She had never had any other business relations of any kind with the bankrupts. Mr. Archer, the head of the firm, told her that he thought she was making a mistake in selling the stock at that time, that he believed that it would be soon worth more money, and he advised her to borrow on the certificate, instead of selling any of the shares, and he offered to make the loan. She gratefully accepted his suggestion. She signed the power of attorney on the back of the certificate, without the blanks in it being filled up. With her signature affixed, it read as follows:

"For value received ——— hereby sell, assign, and transfer unto ———— shares of the capital stock represented by the within certificate and do hereby irrevocably constitute and appoint ——— attorney to transfer the said stock on the books of the within named company, with full power of substitution in the premises. Olive G. Ricker.

"Dated Oct. 10, 1921.
"In presence of Charles T. Harden."

Mr. Archer handed her in return the firm's check for $1,000, and gave her a receipt in the following form:

"Baltimore, Md., Oct. 10, 1921. Received of Mrs. Olive G. Ricker 75 shares Anaconda Copper Co., No. F–126018, registered in her name, and have advanced thereon ———, with the right to rehypothecate the said securities ———. This receipt is negotiable only at this office, and is to be surrendered upon statement for or return of similar securities.

"Archer, Harvey & Co."

Mrs. Ricker says that she merely glanced at it and put it in her pocketbook. She asserts that she did not know what "rehypothecate" meant, and attached no significance whatever to the phrase. On the very next day the bankrupts pledged this stock with the Maryland Trust Company as security for a loan of $2,500, which loan was only one of a number which the bankrupts at the time had of the Maryland Trust Company, all upon an agreement that any collateral deposited with the lender to secure any loan should be security for all. The firm went into receivers' hands a little over two months later, at which time it owed the Maryland Trust Company a sum of $20,200 secured by pledge of a number of securities. It sold all these securities, except the certificate for the Anaconda Copper Company stock and realized from them $1,864.86 more than the indebtedness to it, which sum and the certificate for the 75 shares of Anaconda Copper Company it returned to the receivers.

Mrs. Ricker's counsel earnestly urges that she stands in a different class from the other persons whose securities were wrongfully pledged with the Maryland Trust Company, either in that there was no authority for the bankrupts to pledge them at all, or that they were pledged for more than the bankrupt had any right to hypothecate them. He bases this contention upon decisions of the Court of Appeals of Maryland in Taliaferro v. Bank, 71 Md. 208, 17 Atl. 1036, German Savings v. Renshaw, 78 Md. 485, 28 Atl. 281, and Merchants' Bank v.

289 F.—18

Williams, 110 Md. 334, 72 Atl. 1114, in which it was held that the mere power of attorney to sell the certificate or the stock did not confer upon the holder of such power any right to hypothecate the security, and that the form in which it was put gave notice to all that no such right was conferred, and that consequently a bank who lent money on such certificate did what it had no right to do. The trouble with this contention is that the power of attorney here in question is not like those passed upon in the cases cited, but is substantially identical with that which in the case of Patapsco National Bank v. Mead, 131 Md. 573, 102 Atl. 993, was held sufficient to authorize the pledge of the stock. In that case the Court of Appeals of Maryland said:

"It is difficult to understand how owners of such certificates could use stronger language to show that they intended to vest in the assignee their absolute and entire interest in the certificate and property mentioned."

The facts upon which her claims are based make an unusually strong appeal; but, after all, in all the cases the legal situation was the same, in that in every one of them the bankrupts had pledged other people's property for their debts. I cannot, therefore, see that the particular devices employed by Archer in obtaining possession of her certificate legally distinguishes her case from that of any of the others.

[3] Is her position any the stronger because the pledgee sold securities belonging to other persons, and which the bankrupts had also wrongfully pledged, and out of the proceeds repaid itself the amount of the advance made upon her security and returned the latter to the trustee? There is authority that it is. It was apparently so held in Pippey's Case, In re McIntyre & Co., 181 Fed. 955, 104 C. C. A. 419, Circuit Court of Appeals for the Second Circuit, and in Re Mason & Owen, 284 Fed. 714, Circuit Court of Appeals for the Ninth Circuit, although in the latter the court noted that it had, perhaps, not the full facts before it. There is no question that the Circuit Court of Appeals for the Eighth Circuit has so ruled. Johnson v. Bixby, 252 Fed. 103, 164 C. C. A. 215, 1 A. L. R. 660. Nevertheless the reasoning of Judge Mayer in Re Wilson & Co. (D. C.) 252 Fed. 631, to the contrary, seems unanswerable. The Circuit Court of Appeals of the Second Circuit, in Re Toole, 274 Fed. 337, disclaimed the interpretation which had been put upon their earlier decision in Pippey's Case, supra, and held that all the owners of securities in like class must be given equality of treatment, and that a pledgee, by satisfying its debts out of some of the pledged securities, could not alter the relative rights of those whose property it held. Those depend upon the law, and not upon the accidental or intentional favoritism of the pledgee. I am persuaded that the mere fact that Mrs. Ricker's security survived liquidation after the bankruptcy should not give her any rights superior to those she would otherwise have had.

[4] There is about her case, however, one peculiarity. The last loan the Maryland Trust Company made to the bankrupts was the $2,500 advanced when her stock was deposited with the pledgee. She cannot be called on to do more than to pay off that loan. The other petitioners whose securities were pledged with the same lender have no equity to require that she shall be called on to relieve them from any

of the burden which rested on them before her stock was wrongfully hypothecated. The pledgee, it is true, under the terms of its agreement with the bankrupt, could have used any equity in that stock over and above $2,500 to make good to it any deficiency in the value of the collateral it already held; but, as it turned out, there was no such deficiency. Mrs. Ricker should not be called upon to contribute in excess of the $2,500 for which her certificate was pledged. She may, at her option, pay the $2,500 and receive the certificate, or she may permit the trustee to sell it and out of the proceeds return to her all above that sum.

I am conscious of the unwisdom of introducing new distinctions into the equities in such cases, too complicated as they already are, and it is only when, as in this petition, the facts are clear and the results so manifestly just, that any attempt should be made to marshal the burden on the securities of different owners with reference to the respective dates at which they were pledged.

*The Watson Joint Adventure Claim.*

[5] The Messrs. Watson have two claims in this case. One is similar in all respects to the other petitions to which reference has been made and calls for no other discussion. The other is of a different character. A number of years before bankruptcy, the petitioners and the bankrupts engaged in a joint dealing in certain kinds of securities. These dealings were to be carried on by the bankrupt for the join account of themselves and the petitioners. At the time of the failure, as between the Watsons and themselves, the bankrupts should have had a considerable quantity of these securities on hand. In point of fact, those that they have do not amount to as much as the ordinary customers of the bankrupts have a right to demand. No evidence has been submitted by the petitioners as to the precise terms of the agreement under which this common adventure was entered into or carried on. The only testimony that they have offered is an accountant's report of what the books of the bankrupt show. There is apparently, however, no question that the bankrupts had the management of the joint adventure, and, as is incident thereto, were authorized to sell the securities traded in whenever they deemed such course advisable. It is impossible, therefore, to say the sales they made were not authorized, or that they were wrongful, in the same sense, that their dealings with the securities of the other petitioners certainly were. The claim of the Messrs. Watson, therefore, is not in the same class with that of the others. Whether, if there was more testimony before the court, it would be possible to hold they had an equity superior to that of the general creditors, no one can now say; but, if such testimony were offered, the question would be one of academic interest only, for the other special petitioners will in any event fall short of getting all to which they are entitled.

*Merchants' National Bank Claim.*

[6] On the 22d of December, 1921, a state court receiver was appointed for the bankrupt firm, and shortly thereafter there was filed the petition in bankruptcy upon which adjudication followed. On December 21st, the day before the appointment of the receiver, the

Merchants' National Bank received from the Cleveland Trust Company a draft on the firm of Archer, Harvey & Co. for $1,555.61, attached to which were two $1,000 first mortgage 5 per cent. 30-year gold bonds of the Washington, Baltimore & Annapolis Electric Railway Company. In accordance with the usual practice, the Merchants' National Bank telephoned the bankrupt that it had the draft and the bonds. The bankrupt thereupon drew its check on the Farmers' & Merchants' National Bank to the order of the Merchants' National Bank for $1,555.61. The employee who usually attended to its banking business for it was not there at the time, and this check was given to a Miss Kimmel, one of the bankrupts' clerks. She was told to take the check to the Farmers' & Merchants' National Bank and have it certified, then take the check to the Merchants' National Bank, pay the draft with it, get the bonds, take them to Marshall Winchester & Co., for whom the bankrupt had purchased them, and get the latter's check for them. Miss Kimmel was given several other missions at the Farmers' & Merchants' National Bank. As the result of the various things she had to attend to, when she got to the Farmers' & Merchants' National, she forgot all about asking to have the check certified, and she never presented it to the Farmers' & Merchants' National Bank at all. She then went over to the Merchants' National Bank and handed the uncertified check to the teller, who because he was inexperienced in that line of work, or for some other reason, gave her the draft and the bonds without noticing the check was not certified, or, if he did, without attaching any importance to that fact. She took the bonds up to Marshall Winchester & Co., got their check for $1,555.61, which was the same day deposited by the bankrupt in the Farmers' & Merchants' National Bank. The uncertified check of the bankrupts was held by the Merchants' National Bank, and was not presented for payment until the next day, and not until after the bankrupts had gone into the receiver's hands.

At the time, Miss Kimmel went to the Farmers' & Merchants' National Bank, so far as can now be ascertained, the bankrupt had at that bank a cash balance on deposit of $163.95; but there is testimony that its check nevertheless would have been certified if the bank had been asked to do so. When the bankrupts went into the receiver's hands, the Farmers' & Merchants' National Bank applied its deposit balance, that is to say, the $163.95, plus the proceeds of Marshall Winchester & Co.'s check for $1,555.61, which was $1,719.56 in all, on account of an indebtedness of the bankrupt to it aggregating $19,-922.57. It held as collateral for that indebtedness securities of the approximate value of $26,690.68. The bank sold a portion of these securities, realizing therefrom a sum of $20,018.38, out of which it paid its claim. There remained $95.81 in money and unsold securities of the approximate value of $6,672.30, which have been turned over to the trustee and are now in his physical possession, but in none of them does he appear to have any beneficial interest. The securities pledged to the bank did not belong to the bankrupts. Those of them which survived liquidation, together with the trifle of money paid by the bank to the trustee, are properly claimed by their owner. It fol-

lows that the Merchants' Bank can have no claim upon him in any capacity other than as a mere custodian of these specific securities. The general creditors have not gained by the mistake, if such it was, and cannot be called upon to make good any of the loss the Merchants' Bank suffered in consequence.

But was there any such mistake which gave rise, as against persons other than the bankrupts, to any equity in favor of the Merchants' Bank? After all is said and done, that bank accepted an uncertified check, when it would have been more prudent to have seen that the check was certified; or, to put it in another way, its teller negligently failed to carry out its general instructions, which would have required him to insist that the check be certified. At the time of the presentation of the check, no mistake was made to which the bankrupts were in any proper respect parties. They had intended to have the check certified; they had not done so, and they tendered it uncertified, and it was accepted. If the bankrupt had not closed its doors within 24 hours or less, no legal question could have arisen, because the uncertified check would then have been as good as if it had been certified. I have been referred to no authority in which a mistake of this character has been made the basis of impressing funds with a trust. The case relied upon by the Merchants' National Bank, and which comes nearer to sustaining its position than any other, is In re Berry, 147 Fed. 208, 77 C. C. A. 434. In that case, by the error of bookkeepers, a firm which had many transactions with a bankrupt appeared to owe him $1,500 more than it did. Upon his request, it paid this sum. When the mistake was discovered, the court held that as this $1,500 could be traced, the firm which paid it was entitled to have it back. In all probability, the case was rightly decided, but it seems to have gone as far as the rule can be carried.

To take the step forward the Merchants' National Bank here desires would make it very difficult to draw any line. Anybody that trusted the bankrupt by mistake would seem to be in the same position as the bank. However that may be, it certainly has no equity as against other persons whose securities were improperly subjected by the bankrupt to the payment of its debts. If it has, it must be for the reason it has the right to call on those who owed it nothing to make good its loss, because it is possible that if it had been more careful the bankrupts' wrongful appropriation of their property would have been even larger than it turned out to be. Where the bankrupt has fraudulently or by mistake obtained possession of funds or property of some one, and that other one did not intend to part with the ownership of such funds or property, which are still traceable and have come into the possession of the trustee in bankruptcy, they should go back to the person from whom they came; but, from a public standpoint, nothing is to be gained by extending this doctrine by analogy.

The petition of the Merchants' National Bank must be dismissed without prejudice to its right to file its claim for the amount in controversy as a general creditor.