## STATUS OF CLAIMS AGAINST A FIRM OF INSOLVENT BROKERS.

Common Pleas Court of Hamilton County.

AUGUST STEINKAMP v. HERBERT I. CHANNER ET AL.

Decided, April Term, 1924.

*Brokers—Situation Arising where Securities Purchased for Customers by Insolvent Brokers have been Pledged by the Brokers for Loans—Genesis of Title of Claimants—Implied Authority of Broker to Pledge Stocks not Fully Paid for, but to the Extent only of the Indebtedness Remaining—Customers inter sese Co-Sureties in Proportion to their Indebtedness to the Brokers—Dividends Collected by Brokers—Rights of Claimants become Fixed as of the Date of the Receivership.*

Channer & Sawyer, a stock brokerage partnership, became insolvent, and in an action by a claimant seeking equitable relief, a receiver was appointed. The action resolved itself into virtually a dissolution of the partnership and a distribution of its assets By intervening petitions and proofs of claims title to certain property in the hands of the receiver was asserted and other claims have been filed in the form of claims of general creditors. The pleadings and proof raised issues as to the rights of the claimants against the partners and among themselves making it necessary to marshall the assets. It was

*Held:—*

1. For a claimant to occupy any status other than that of general creditor it was necessary for him to establish the genesis of his title to some form of property by proving either the delivery of the property to the broker, its purchase from him by the broker, or a contract to purchase from the broker and an appropriation by the broker of specific property to the contract of purchase, and in addition in every case prove that his property in its original or some converted form came into the possession of the receiver.

2. When a customer purchases stock from a broker, on credit in whole or part, he impliedly authorizes the broker to re-pledge the stock either alone or with stock of others customers for the unpaid balance.

3. Customers whose stocks have been re-pledged together to secure an indebtedness of the broker are *inter sese* co-sureties in the proportions of their indebtedness to the broker at the time of the repledging.

4. When stock has been paid for in full the broker has no implied authority to re-pledge at all, and if paid for in part the implied authority to re-pledge is only to the extent of the unpaid balance. Any re-pledging in excess of the implied authority is wrongful.

5. As between customers whose stocks have been rightfully re-pledged and customers whose stocks have been wrongfully re-pledged by the broker, the claims of those whose stocks were wrongfully re-pledged are of superior equity to those whose stocks were rightfully re-pledged. The latter, having agreed in law to the re-pledging are in effect principals to the debt as to the claims of the former.

6. The authority of the broker is to be determined by conditions existing at time of re-pledging.

7. The rights of the parties became fixed at the date of the receivership, and no act in the liquidation of the assets thereafter by either the re-pledgee or the receiver could change them.

8. Failure of a claimant to assert title to property does not enlarge the claim or distributive share of any more diligent claimant. Each claimant recovers on the strength of his own title and the receiver being in possession has a good title to any residue for distribution among the creditors of the partnership.

9. Channer & Sawyer collected dividends on stocks that were in the possession of certain customers who owned the stocks, and this dividend money was deposited in banks to which Channer & Sawyer were indebted, the indebtednes being secured by the re-pledge of stocks belonging to other customers. Upon the receivership the banks applied the bank balance to a reduction of the indebtedness, and upon a liquidation of the collateral a balance remained after satisfying the bank claim which balance came into the possession of the receiver. The owners of the stocks upon which the dividends were paid claim that they own to the extent of the dividends the balance that came into the possession of the receiver and are entitled to have their dividend claims satisfied in full therefrom. It was

*Held:*—

That the residue of the re-pledged collateral belonged to the customers whose stocks had been re-pledged, that the general creditors of Channer & Sawyer got no benefit from the appropriation of the bank balance by the banks, and that to prefer the dividends claimants to the owners of the collateral stock the proceeds of which came into the hands of the receiver, would be taking the property of one innocent person to pay the claim of another who was no more innocent.

*Peck, Shaffer & Williams,* for plaintiff.

*Hugh L. Nichols; Peck, Shaffer & Williams,* and *Maxwell & Ramsey,* for receiver.

*John Druffel,* for Herman Kirschner.

*John C. Thompson,* for Louis and Virginia Guilfoyle.

*Cohen, Mack & Hurtig,* for Hentz and Kirschner.

*A. J. Zanone,* for Chas. E. Duveneck.

*Samuel Rotter,* for Michael F. Hoffman.

*Louis Capelle,* for Henry Chipman and E. H. Weachter.

*Ben B. Nelson,* for Nina B. Beard.

*Hicks & Hicks,* for Thos. Smith and Mary J. Cushing.

*Clarence H. Hallman,* for Gaylord F. Wiley.

*Frank R. Gusweiler,* for John H. Flynn.

*Jos. Lemkuhl,* for Park Gilmore and John H. Schulte.

*T. W. Cowguill,* for Anna W. Furst.

*Frost & Jacobs,* for J. D. Cloud.

*I. B. Davidson,* for Albert Roeder.

*Albert H. Morrill* and *Joseph Sagmeister,* for Ben T. Hughes.

*W. H. Haas,* for Edith Clawson.

*G. F. Boughner,* for H. J. Beinforde.

MATTHEWS, J.

This was originally an action by the plaintiff to charge the defendants as trustees *ex maleficio* of certain assets into which he alleged they had wrongfully converted securities that had come into their possession as his broker. Because of the intervention of other claimants, issues raised by the pleadings of the original parties and the appointment of a receiver, the action now is, in effect, one for the dissolution of a partnership and the administration of its assets. The partnership, which was engaged in the stock-brokerage business, is insolvent. Inasmuch as those occupying the status of general creditors must suffer a loss, various customers have by pleadings and proof sought to establish for themselves a different status. Notwithstanding the plaintiff and other customers, representing in the aggregate perhaps .98 per cent of the vital liabilities, have agreed, *inter sese,* to accept the status of general creditors,

there still remain claimants asserting rights in substantial amounts who contend for superior rights. The plaintiff and those who have agreed with him for a pro rata distribution among themselves take the position that this leveling process should be extended to cover all claims. The receiver, through his counsel, takes the same position. The question presented is whether or not any of the claimants, and if so, what ones, have established rights superior to that of general creditors.

There is no question before the court as to priority of payment among creditors. The only claims of priority that have been presented are by certain employees asserting claims for work and labor, but these claims are not now before the court for decision. With the exception of these possible work and labor claims, if it is once determined that the claimant is a *creditor* and nothing more, it is clear that he must share *pari passu* with all other creditors. These non-concurring claimants present themselves to the court not primarily as creditors of Channer & Sawyer, but as the owners of property of which Channer & Sawyer were in possession, and which in its original or converted form passed into the custody of the receiver upon his appointment. To successfully maintain this position it is therefore incumbent upon the claimant to establish the genesis of his title to some form of property by proving either its delivery to the broker, its purchase for him by the broker, or a contract to purchase from the broker and an appropriation by him of specific property to the contract of purchase, and in addition be able to point to an item of property that came into the possession of the receiver as the identical property of which he was originally or subsequently became the owner; or to property into which he traces the proceeds of his con verted property. If he fails to do this,—if he can not show that title ever passed to him, or if having proven title to property originally he fails to identify any property in the hands of the receiver to which that title may attach—no matter how great a wrong may have been inflicted upon him, his right is personal as distinguished from a proprietory right and his status is that of a general creditor. Of course, all creditors as

against their debtor are entitled to be paid in full. This is as true of a debt created by the intention of both creditor and debtor as of a debt created by implication of law upon the tortious conversion of the property of another. While in the latter case the ancillary remedy of attachment and garnishment may be invoked, still in both instances the remedy is by personal action to enforce a personal right resulting in a personal judgment for money enforcible by execution running against all the property of the judgment debtor. An action based upon either a legal or equitable title to a *res* on the contrary results in a judgment or decree limited to the specific thing which is the subject-matter of the action and that in substance is the nature of the remedy invoked by the intervenors. The intervening petitions are, in effect, proceedings in reclamation. It is clear that the owner of any *res* that happens, fortuitously or otherwise, to be in possession of the receiver is entitled to have it, or its proceeds delivered to him against both Channer & Sawyer and their creditors, whether preferred or general. It is only when the rights of claimants, seeking to reclaim, conflict, that there must be a yielding in whole or part. This situation arises when fungible property of two or more have become commingled and the whole is insufficient to satisfy the titles of all, or where the property of two or more have become charged with a burden which all are, in equity, equally bound as between themselves to bear. These conflicting titles of customers of stock-brokers most frequently result from the re-pledging of stocks and bonds by the broker. He may have re-pledged securities under the implied authority to do so to finance the transaction of a margin customer. He may have done it under express authority. He may have done it without any actual authority but under an apparent authority resulting from possession of the *indicia* of ownership and authority. The securities of many customers may have been re-pledged to secure the same indebtedness of the broker. Examples of all these are to be found in this case. Ordinarily it would be necessary to examine and analyze the authorities of the applicable subjects and deduce the rules by which to decide

these conflicting claims. This task has been in a large measure already performed by the able and exhaustive opinion of Judge Darby in the case of *Citizens National Bank* v. *Anderson,* 24 N. P. (N.S.), 361. Judge Darby examined the authorities then extant and deduced the rules therefrom the application of which enables the court to de termine most of the issues in this case. Counsel challenge the correctness of the rule followed by Judge Darby whereby claimants to a fund were divided into classes based upon the quality of their equities. It is contended that the classification is based upon an attempt to determine degrees of guilt. In the opinion of the court the distinction and classification is sound, was in accordance with the almost uniform tenor of the authorities at the time and has been confirmed and strengthened by all the decisions that have been rendered since. It is not based upon any determination of degree of guilty conduct by the broker. The basis is the distinction between consent and non-consent to the re-pledging of the securities. All customers who consented stand on the equal basis of co-sureties to the extent of their consent. Those customers whose stock was re-pledged without their consent bear no such relation to the transaction. The re-pledgee is entitled to subject their stock to the payment of his debts but such stock is surely secondarily pledged as compared to the stock whose owners consented and agreed to the re-pledging. It seems to the court that all that has been decided in this class of cases results from the familiar doctrine of following trust funds and the application of fundamental equitable principles of indemnity and contribution to their distribution. Counsel are referred to Judge Darby's opinion for the rule by which the court is guided in passing upon specific claims in addition to the reasons expressly stated in passing upon them. Before proceeding to consider the various claims separately, there are a few applications of principles which the court desires to mention, so as to make clear its ruling upon certain claims.

1. Where securities of two or more customers are repledged to secure a single indebtedness, whether they shall bear the

burden of the debt proportionately, or some bear it to the
exoneration of others, depends on whether some securities were
re-pledged rightfully and others wrongfully.    In *re Irving
Whitehouse Co.*, 293 Fed. 287.    Those customers who con-
sented to a repledging of their securities are as to those
whose stocks were re-pledged without their consent as
much principals to the debt as the broker himself is, and to
the extent of their securities bound to indemnify the non-
consenting customers.  . That is the principle upon which the
distinction between the so-called Class A and Class B creditors
is based.    Class B claimants to the extent of their re-pledged
securities are primarily bound so far as Class A claimants are
concerned.    The members of the two classes are, *inter sese,* co-
sureties in the proportion that their stocks so re-pledged bear
to one another.    As is said in *Unangst* v. *Roe,* 177 N. Y. S., 706
to 710:

"The right of contribution among co-sureties arises from the
nature of the relationship.    The relationship in this case arises
from the fact that both the plaintiff and the defendant Roe
have given authority, express or implied, to the brokers to
pledge their property as security for the brokers' debt, and
that through such pledge each has become to that extent a
surety for such indebtedness, and as between themselves co-
sureties, even though without any agreement on their part.    So
long as both continue sureties for the same debt, the relation-
ship of co-sureties ·continues with all its usual results."

While *Unangst* v. *Roe, supra,* is the decision of a nisi prius
court, it is in harmony with the overwhelming weight of the
authorities, and for that reason and because the opinion is
particularly lucid, it is quoted from to make clear the grounds
upon which the court rests its decision in the case at bar. The
dividing line between the two classes being based on the differ-
ence between a·rightful and a wrongful re-pledging, it follows
logically that when the stock of a margin customer is re-
pledged for more than the balance due to the broker, as to the
excess the re-pledging was wrongful and to that extent the
margin customer stands upon an equality with a customer the
repledging of whose stock was wholly unauthorized. It has been

so decided in *In re Archer*, 289 Fed.. 267, the first paragraph of the syllabus of which is as follows:

"On bankruptcy of a broker, who, without express authority has pledged securities deposited with him by customers, some to secure indebtedness and some not, those customers who. were indebted but whose securities were pledged for more than their indebtedness as to the excess are in the same class as customers owning pledged securities who were not indebted."

2. Another rule which seems to deserve mention is that the right of the parties became fixed at the time of the appointment of the receiver and the legal status then existing could not be changed by any subsequent action. As was said in *Unangst v. Roe, supra*, at 712:—

"The rights of the parties between themselves became fixed when the brokers made their assignment and the trust company was compelled to resort to the collateral deposited as security. All of that collateral was subject to the same obligation and lien, and its owners as co-sureties were entitled then to contribution from each other for any loss sustained. Their rights could not be changed or determined by any hazard of chance in the order of sale or by any selection of the pledgee bank."

3. The claimants asserting title must recover on the strength of their own title and can not gain any advantage by pointing to the weakness of the title of the receiver. Therefore the failure of certain customers to assert their rights can not augment the amount to be received by the diligent customers. The receiver having custody has a title that is good against every one not showing a better title and the claimants by pointing out that some customer who has not asserted any right has a title better than the receiver do not disclose in themselves a title superior to that of the receiver. *In re Archer-Harvey Co.*, 289 Fed., 267.

4. Whether a re-pledge is authorized or unauthorized and therefore a rightful or wrongful re-pledge is to be determined by the facts existing at the time of the re-pledging. No subsequent change of circumstances destroys the authority

that existed at the time of the re-pledging. In *Unangst v. Roe, supra*, at 709 and 710 court says:—

"The mere fact that prior to the assignment of the brokers the defendant Roe paid his debit balance to them does not, I think, alter the situation, except in so far as it increased the value of Roe's interest in such securities, and might therefore change the proportion in which he would share in the proceeds of the fund. From that time he, of course, owned the securities free from any lien of the brokers. He had, however, given the brokers authority to pledge these securities with the banks, and while the brokers might be under a contractual obligation to return the securities to him on demand, such a demand, even if peremptory and for immediate delivery, could not revoke *ab initio* the authority previously given, or make tortious an act performed with the defendant's consent. The right of the leader to look to this collateral became fixed when the pledge was made. These rights were given to it by Roe's authority, and neither Roe nor the brokers could change these rights without the lender's consent. The payment of the debit balance to the brokers freed the securities from the lien of the brokers, but did not free them from the lien of the banks to which they had been pledged. They could be freed from that lien, and the right to immediate possession revested in the defendant, only if the debt to the bank was paid or a substitution of collateral made with the consent of the lender."

5. It is a familiar doctrine of the law of sales that when a contract for the sale of unascertained goods is made, no title passes until the goods are identified and appropriated to the contract. In the nature of things no title could pass until that had been done. Mecham on Sales, Section 721-22 and 727. This rule is codified in the sales act as General Code 8397. Therefore when customers contracted to buy from Channer & Sawyer as vendors no title passed until specific stock was set aside in fulfillment of the contract. The mere fact that Channer & Sawyer had stock with which they might have performed is not sufficient to cause title to pass in that stock to the customer where no specific mass is pointed out and no intent to pass title in an undivided portion proven. Williston on Sales (2d ed.) Section 156. Of course, in the instances in which the broker acts in his capacity of broker and purchases stock from

144     HAMILTON COUNTY COMMON PLEAS.

Steinkamp v. Channer et al.     (Vol. 25 (N.S.)

a third person for his customers the title passes directly from the third person to the customers. That is the sort of transaction that the United States Supreme Court had before it in *Duel* v. *Hollins*, 241 U. S., 523, as is shown by the statement of facts on pages 524 and 525. Furthermore, when the contract was to purchase from Channer & Sawyer as principals and they had stock in pledge which they might have redeemed and used to perform the contract of sale but did not, the customer would, of necessity, if he took title at all, be obliged to take the title subject to the pledge. The pledgor could give no better title than he himself had. That is a principle old in the law of sales and has been codified. General Code Section 8403.

6. Wherever the character of conduct is equivocal and may be characterized either as lawful or unlawful under the evidence the presumption of innocence should be indulged, but, if so desired, leave will be granted to introduce additional evidence to give a conduct its true character.

A very elaborate and informing article is contained in 37 Harvard Law Review at 860 (Issue of May, 1924) upon subject of stock brokerage, bankruptcies, and most, if not all, of the principles necessary for the decision of these claims are clearly deduced from the authorities, practically all of which are considered and analyzed.

Coming now to consider the specific claims they will be taken up in the order set forth in the brief of counsel for the receiver and these principles applied to the facts developed relating to a sufficient number of claims to make clear the decision to be arrived at by their application to the facts of the other claims.

The first claim is that of

### NINA B. BEARD.

The evidence relating to this claim shows that the claimant was told that her stock would be pledged with the bank. While it is the opinion of the court that there was an implied authority to re-pledge, still in view of the testimony of the claimant

the basis of the decision is that the language used at the time imported an express authority to re-pledge. The pledging of this stock was therefore rightful to the extent of the balance owned by O. L. Beard at the time. The claimant is therefore to the extent of the amount owned by O. L. Beard at the time in the position of one whose stock was rightfully pledged and upon the distribution of the fund into which this stock has been traced she is entitled to share ratably with those whose stocks were rightfully pledged, but must share secondarily to those customers whose stocks were wrongfully pledged to secure the same obligation.

### HENRY CHIPMAN.

This claimant paid cash for stock which was purchased by Channer & Sawyer through Clark, Childs & Co., their New York correspondent, to whom they were largely indebted, and which indebtedness was secured by stocks of various customers. The stock purchased for Chipman under the course of dealing between Channer & Sawyer and Clark, Childs & Co., was held by Clark, Childs & Co. as an integral part of the collateral securing their indebtedness. The court holds that this was a wrongful re-pledging, for the reason that Chipman, having paid in full for his stock at the time he placed the order, had a right to have the stock purchased and paid for by Channer & Sawyer, who were acting as his brokers, and when they purchased it through Clark, Childs & Co. and allowed it to be incorporated in the security for their general indebtedness to Clark, Childs & Co., they exceeded their authority and the re-pledging was therefore wrongful in its entirety. For this reason this claim is given precedence over all claimants to the Clark, Childs fund whose stocks were rightfully pledged.

### EDITH CLAWSON.

This claimant sent 210 shares of American Rolling Mill Co. common stock to Channer & Sawyer, with instructions to sell it and purchase therewith 60 shares of preferred stock of the same company. The sale of the common stock was made but

before the purchase of the preferred stock was consummated the receiver was appointed. The claimant lost title to the common stock by virtue of the sale made under her authority by Channer & Sawyer. She acquired no title to any preferred stock for the reason that none was purchased for and on her behalf. The claimant's right is therefore that of a general creditor, and not entitled to share in the proceeds of any pool or fund made up of stocks that belonged to the customers of Channer & Sawyer.

### J. D. Cloud.

This claimant contracted to purchase stock not through, but from, Channer & Sawyer. In other words, Channer & Sawyer personally contracted to sell stock to the claimant. At the time the contract was entered into, however, the parties were not dealing with reference to any specific fifty shares of Churngold stock, and Channer & Sawyer could have performed their contract by the delivery of any fifty shares of Churngold stock selected by them. They, however, did not at any time select fifty shares of Churngold stock and appropriate it to this contract. The transaction therefore was a contract to sell as distinguished from a sale, no title to any stock passed to the claimant and he now occupies the status of a general creditor.

### John H. Flynn.

At the time of the re-pledging of this customer's stock he was indebted to Channer & Sawyer, and therefore to the extent of the indebtedness the re-pledging was rightful. The fact that he subsequently paid the balance of his indebtedness to Channer & Sawyer did not operate retroactively so as to make wrongful a re-pledging that was rightful at the time. To the extent therefore that he was indebted to Channer & Sawyer at the time of the re-pledging, the re-pledging was rightful, and his claim subordinate to the claims of customers whose stocks were wrongfully pledged.

### Louis P. and Virginia E. Guilfoyle.

The evidence relating to these claims is that the claimants had been customers of Channer & Sawyer purely in their capacity as stock brokers. Such transactions, however, had been closed and subsequently they borrowed $5,000 and deposited 200 shares of Churngold Company stock as collateral security. The tracing of these shares shows that 110 shares were transferred to Westheimer & Co.; 10 shares to Michael J. Enright; 40 shares were pledged to the Union Trust Co. and 40 shares to the Fourth & Central Trust Co. There can be no question but what the claimants completely lost all title to the 120 shares that were sold. There has been no effect, and it would not be possible to trace this stock or its proceeds into any specific fund now in the hands of the receiver. As to the 120 shares, therefore, the claimants are general creditors. As to the 80 shares traced into the Union Trust Co. and Fourth & Central Trust Co., collateral, the claimants must be regarded as customers whose stock was rightfully pledged to the extent of the indebtedness then existing to Channer & Sawyer, unless the sales to Westheimer and Enright preceded the re-pledging and entirely extinguished the debt. Their claim is, therefore, to the extent that the re-pledging was rightful, (that is, to the extent of indebtedness then existing) subordinate to claims arising out of wrongful re-pledging.

Counsel urges that in this transaction Channer & Sawyer should be regarded as pawnbrokers loaning money, rather than stock brokers executing purchases and sales on behalf of customers, but whether they are regarded as one or the other; there was a right to re-pledge to the extent of the existing indebtedness. The wrong was committed when they failed to free the security of the re-pledging debt, so as to deliver it to the pledgors upon payment of the balance due. That wrong, however, did not make the original re-pledging wrongful.

HERMAN KIRSCHNER.

This claim divides itself into five parts. He purchased 100 shares of Chandler Motor stock through Channer & Sawyer. The evidence, however, shows that Channer & Sawyer prior to the receivership sold all the Chandler Motor stock which stood in its name and concealed the fact by false entries in their books. So far as the Chandler Motor stock is concerned therefore, the claimant lost all title to it and became a general creditor for its value. He was entitled, of course, to have his account credited with that value by Channer & Sawyer but this was not done. His rights, however, must be determined as though that credit was actually made.

If after giving Kirschner credit for the Chandler Motor Co. stock, he was not indebted to Channer & Sawyer in any sum, there was no right to re-pledge any of the other stock of this claimant for any sum. However, Channer & Sawyer had the *indicia* of ownership of the other stock, and if they did re-pledge it, the re-pledgee acquired a good title and the claimant would be on an equality with those whose stocks were wrongfully re-pledged. The record is not clear as to when the Studebaker Co. stock, The Household Products Co., stock and The French Bros.-Bauer Co. stock were re-pledged. If they were repledged after the conversion of the Chandler stock, then the re-pledging was wrongful and the claimant is entitled to be placed in Class A in the distribution of the fund into which these stocks are traced. If the re-pledging of the stock was prior to the conversion of the Chandler stock, then the re-pledging to the extent of the then indebtedness of Kirschner to Channer & Sawyer was rightful and to that extent, and in that extent, the claimant must be placed in Class B in the distribution of the proceeds of the funds into which the stocks were traced.

The 25 shares of Cincinnati, Newport & Covington Co. stock were pledged separately to Helen Andrews. The stock of no other customer was re-pledged to secure the same debt and therefore upon the payment of the indebtedness to Helen Andrews, the claimant is entitled to the return of the stock.

### ALBERT WEACHTER.

The circumstances relating to this claim are somewhat different from those relating to any other claim. The claimant was indebted to Channer & Sawyer and upon the application of the general principle they had the right to repledge stock to the extent of the indebtedness. It appears, however, that the claimant purchased 200 shares of Sinclair Oil Co. stock and paid for it in cash at the time of the giving of the order. The circumstances show that the parties did not intend that these 200 shares should become a part of the general account of the claimant but were to be kept separate and the certificate actually delivered to the claimant. The court believes that an actual agreement negativing any implied authority to repledge can be inferred from the language and conduct of the parties with reference to this stock. The re-pledging of it was therefore wrongful and the court places this claimant in Class A for that reason.

### B. T. HUGHES.

The evidence relating to this claim shows that the claimant was indebted to Channer & Sawyer and was requested to furnish additional security. He thereupon furnished Midland Bank stock, which Channer & Sawyer advised him was unsatisfactory, and requested him to substitute some other security. He therefore sent a Liberty Bond of the par value of $1,000, which Channer & Sawyer accepted, on the condition that the Midland Bank stock was to be returned to the claimant. The bank stock was not returned and was subsequently pledged to the Fourth National Bank, together with other securities as collateral to a debt of Channer & Sawyer. This re-pledging of the Midland Bank stock was wrongful and the claimant is entitled to be placed in Class A in the distribution of the fund that has come into the hands of the receiver in liquidation of the collateral of which the Midland Bank stock was a part. The fact that the Midland Bank stock survived the liquidation does not increase or diminish his rights.

### MAX FELDMAN.

This claimant was indebted and therefore to the extent of the indebtedness the repledging of his stock was rightful. He is therefore in Class B.

The court has not considered whether it can be determined from the evidence thus far introduced which stocks of debtor customers were re-pledged for an amount in excess of the indebtedness of the respective customers. In determining that question when stock was incorporated in an existing pledge, the comparison of the total indebtedness of the customers in that pledge to Channer & Sawyer at that time with the indebtedness which Channer & Sawyer then owed to the re-pledgee, would determine the point, and if necessary, additional evidence may be introduced upon the subject. If a customer's stock was rightfully pledged in part and wrongfully pledged in part, the part wrongfully pledged should be placed in Class A, and all in Class A should be paid before any amount is allotted to Class B.

The foregoing are all the claimants who have filed intervening petitions in this case. Various claimants have filed affidavits with the receiver setting forth their claims and these claims have been brought upon the record in the form of a report by the receiver. The court has concluded that these claims should be given the same consideration as those who have filed intervening petitions, but it seems to the court that the application of the principles which have guided the court in the decision of the claims on the intervening petitions will enable counsel to determine the rights of those claimants who have filed affidavits and that therefore it will not be necessary for the court to indicate its decision upon them separately. If counsel have any doubt as to the rights of any such claimant by the application of the principles heretofore announced, they may bring the specific matter to the attention of the court.

### PARK GILMORE and JOHN H. SCHULTE.

These are claims for dividends collected by Channer & Sawyer prior to the receivership upon stocks the certificates of

which were in the possession of the claimants who owned the stock. The stocks had been in the name of Channer & Sawyer upon the books of the corporations and apparently so stood at the time the dividends were declared and as a result the dividend checks were sent to Channer & Sawyer, who deposited them in bank, and it is now claimed that inasmuch as this money can be traced to the bank accounts of Channer & Sawyer, and as these bank accounts were used by the various banks to extinguish the indebtedness of Channer & Sawyer and thereby release securities from the encumbrance which enhanced the amount left upon liquidation, that therefore inasmuch as the receiver got the residue they have succeeded in tracing their money into the hands of the receiver. Th difficulty about the position of the claimants is that none of the money that came into the hands of the receiver upon the liquidation of the collateral held by these banks belongs to Channer & Sawyer, the collateral belonging not to them but to their customers, and this money that came into the hands of the receiver belongs to the customers whose stocks constituted the collateral. The general creditors got no advantage from the dividends of the claimants. Their dividends went to relieve the collateral of other customers from an encumbrance. The doctrine of following a trust fund has never been extended so far as the court knows to the extent urged by claimants. The principle upon which the court decided the claims of the Merchants National Bank in the case of *In re Archer, Harvey & Co.*, 289 Fed. Rep. 267 at 275 to 277 seems to the court to be applicable to these claims. It is a case in which there was a conversion of property but no trust arose out of the conversion, and therefore the doctrine of tracing trust funds does not apply. Furthermore, as heretofore stated, the general creditors obtain no advantage and to take it out of the fund that belongs to the other customers whose stocks were pledged as collateral would be to transfer the fund to an innocent person from one equally innocent.

A decree may be prepared adjudicating the various claims in conformity to the principles set forth in this opinion.